## DU PONT et al. v. DU PONT et al.*

(Circuit Court of Appeals, Third Circuit. March 6, 1919.)

### No. 2382.

1. CORPORATIONS ⬰316(3)—OFFICERS—PURCHASE OF STOCK OF CORPORATION.
The fact that the members of a syndicate, formed to purchase the stock of a large stockholder in a corporation, were all officers and stockholders of the corporation, did not, per se, render the purchase inequitable or wrongful as against the corporation.

2. CORPORATIONS ⬰320(11)—OFFICERS—PURCHASE OF STOCK OF CORPORATION —EVIDENCE.
Evidence held insufficient to show that officers of a corporation, in purchasing stock of another stockholder and in borrowing money to pay therefor, made any improper use of their official connection with the company, or of its credit, which made them trustees ex maleficio of such stock for the corporation.

3. CORPORATIONS ⬰316(3)—PURCHASE OF STOCK BY OFFICERS—LEGALITY.
Action taken by the finance committee of a corporation on an offer by its president to sell to it part of his stock, to be distributed to important employés at cost, considered, and on the evidence, consisting of its minutes and the testimony of its members, in connection with their subsequent acts. held a rejection of the offer, and not a retention of it with the appointment of one of the members as agent to conduct further negotiations, and further, held that, if such agency was created, such member did all that was required of him in good faith as agent, or as an officer of the company, to carry the project through, and was not precluded from joining with other officers and stockholders, after the offer had been withdrawn by the president, in dealing with him on their own behalf for the purchase of any part or all of his stock.

4. CORPORATIONS ⬰393—STOCKHOLDERS—MANAGEMENT OF CORPORATE AFFAIRS—JUDICIAL SUPERVISION.
Whether a corporation, having the right and the legal power to take over a purchase of its stock by certain of its officers, shall exercise that right, is a question of corporate policy, to be determined by its stockholders, and not by a court.

5. CORPORATIONS ⬰393—MANAGEMENT OF CORPORATE AFFAIRS—JUDICIAL SUPERVISION.
A court of equity is not warranted in interfering with the management and policy of a corporation, as determined by a majority of its stockholders, unless it clearly appears that their action was not taken in good faith, in the interest of all stockholders.

6. CORPORATIONS ⬰197—STOCKHOLDERS' MEETINGS—RIGHT TO VOTE.
A stockholder is not disqualified from voting on a question of corporate policy merely because he is related to a person who favors or opposes such policy.

Appeal from the District Court of the United States for the District of Delaware; J. Whitaker Thompson, Judge.

Suit in equity by Philip F. Du Pont and others against Pierre S. Du Pont and others. Decree for defendants, and complainants appeal. Affirmed.

For opinion below, see 251 Fed. 937.

⬰For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
256 F.—9     *Certiorari denied 249 U. S. —, 39 Sup. Ct. 492, 63 L. Ed. —.

William A. Glasgow, Jr., Frank P. Prichard, and Henry P. Brown, all of Philadelphia, Pa., and Robert Penington, of Wilmington, Del., for appellants.

George S. Graham, of New York City, George Wharton Pepper, of Philadelphia, Pa., William S. Hilles, of Wilmington, Del., and William H. Button, of New York City, for appellees.

Before BUFFINGTON and McPHERSON, Circuit Judges, and HAIGHT, District Judge.

BUFFINGTON, Circuit Judge. In the court below, Philip F. Du Pont, a citizen of Pennsylvania, filed a bill against the E. I. Du Pont de Nemours Powder Company, a corporate citizen of New Jersey, hereafter called the Powder Company, and 2 corporations and 13 individuals, corporate citizens of Delaware. Proofs were taken, and after final hearing the court entered a decree dismissing the bill. Thereupon the plaintiff took this appeal.

The bill was filed by Philip F. Du Pont, as a stockholder of the Powder Company, for and on behalf of himself and such stockholders as might intervene, and its purpose was to enforce a right of action alleged to be in the Powder Company, against the 13 individuals named, and which right of action the Powder Company would not maintain, because it was under the domination of said defendants, or some of them. It will thus be seen that the real plaintiff in the cause is the Powder Company, and the real defendants are the other defendants, who, as is alleged, are liable to the Powder Company on the cause of action which Philip F. Du Pont here seeks to enforce. We shall therefore treat the case as, in reality, one brought by the Powder Company against these other defendants.

[1] Such being the real status of the case, our first inquiry naturally is: What is the alleged cause of action of the Powder Company against these individuals? In that regard the individuals may be grouped in two classes: One composed of six men, to wit, Raskob, who was treasurer of the Powder Company and a director, Carpenter, a director, and four Du Ponts, viz. Alexis, Irénée, Lammot, and Pierre, all of whom were directors as well as administrative officers of said company. These six men, hereinafter called the syndicate, bought the stock of the Powder Company, hereinafter called the Coleman stock. The second class is the Du Pont Securities Company, hereinafter called the Security Company, a Delaware corporation formed by the syndicate for the purpose of financing the purchase and thereafter holding the Coleman stock after its purchase by the syndicate. The third group is composed of Harry F. Brown, William Coyne, Harry G. Hoskell, John P. Laffey, and the two Du Ponts, Eugene and Henry F., all of whom were directors of said company, and who, as well as the syndicate members, acquired from the syndicate shares of stock in the Security Company above referred to.

Turning first to the right of action of the Powder Company against the members of the syndicate, we note that in February, 1915, John J. Raskob was the treasurer of the Powder Company, and as such treasurer, and generally under the directions and contract of the board

of directors and its finance committee, had charge and control of the deposits of the Powder Company. Raskob was also a director of the company. At that time Coleman Du Pont owned 13,899 shares of preferred and 63,214 shares of its common stock, about one-fifth of the total issue. On February 13, 1915, he wrote the following letter to Pierre S. Du Pont, one of the defendants:

"Dear Pierre: I got a little too gay last week, and have been on the 'blink' for five or six days, but am getting along all right now.

"The more I have thought of the stock question, the more I believe, with what little information I have, that the common stock should reach 250 and may reach 300. If this is true, the men who are now at the helm and actually doing things should make the profit as between to-day's figure and that figure; it will be by far the best thing that can happen to the company. So clear I am that this is the right time to get them interested that I am willing, figuring as surely as I can that this stock will go much higher, to let go for the benefit of the men who are working, which, of course, means the benefit of the company, 20,000, 30,000, or even 40,000 shares at to-day's market which I assume is about 200. As to the details of working this out I am entirely willing to leave this to you and Lew.

"If much time is desired, the price should be higher. If the arrangement for cash payment is made through banks, there should be no increased price. In order to get time when we purchased the company originally, what we gave to be allowed time amounted to, I believe, over 100 per cent. increased price, this because the element of chance must necessarily come in.

"Of course, I am only using my best judgment in this matter, but I am willing and strongly urge that the heads of departments and younger members of the family become most interested in the common stock."

This letter was shown to Raskob by Pierre Du Pont on February 17th, and what follows is thus stated in his testimony by Raskob:

"Mr. Du Pont handed me this letter, and said to read the letter over, and he would like to talk with me about it. I did read the letter over, and later in the day had a conference with him. We talked over the matter of the purchase of certain shares of common stock, from Mr. Coleman Du Pont. Later on Mr. Irénée Du Pont, Mr. Lammot Du Pont, Mr. Carpenter, Mr. Pierre Du Pont, and I had a conference. I think Mr. Felix Du Pont was not at that conference, but was at a later one. The result of those several conferences was a decision that six of us would endeavor to purchase a substantial block of Mr. Coleman Du Pont's stock, and we directed that a telegram be sent to him through Mr. L. L. Dunham, his secretary, to ascertain whether Mr. Coleman Du Pont would be willing to pool the voting of the balance of his stock, in case we bought a portion of it. The reply that Mr. Dunham gave us was that Mr. Du Pont was unwilling to commit himself to pooling the vote, as I recall it. That resulted in our inquiring as to whether he would be willing to sell his total holdings, to which he replied he would. These negotiations were, of course, conducted through Mr. Dunham. We then sent a telegram to Mr. Coleman Du Pont, making him an offer for his entire preferred stock holding at $80 per share."

On receipt of Coleman's offer to sell, Raskob, on behalf of the syndicate, on February 19, 1915, went to New York to see Morgan & Co., and ascertain whether they would furnish the money, over and above the amount they could get Coleman Du Pont to take notes for, which would be necessary to buy the Coleman stock. Morgan & Co. having agreed to do so, Raskob told Pierre Du Pont that night what he had done in New York, and the next day the syndicate met in Wilmington and determined to buy all of Coleman's stock, in pursuance of which telegraph and phone messages were exchanged that day

between Coleman Du Pont and Pierre Du Pont, whereby the former agreed to sell and Pierre to buy all of Coleman's preferred stock at $85 and all his common stock at $200; $8,000,000 to be paid to Coleman in cash, and $5,831,865 in seven-year notes.

The purchase having been arranged with Coleman, Raskob and Pierre Du Pont went to New York on February 23d, saw Morgan & Co., who, for an agreed commission of $160,000, undertook to furnish the $8,000,000 cash required to pay Coleman. Papers were thereafter drawn in fulfillment of this arrangement, and on March 2d Raskob and Pierre Du Pont again went to New York and closed the $8,000,000 loan arrangement made with Morgan & Co., and delivered to the Bankers' Trust Company—which Morgan & Co. had designated to do the financing, trusteeship, etc., of the matter—the stipulated security, and received in return the $8,000,000 Morgan & Co. had agreed to furnish.

Without now entering into details of the preceding matters, the outcome was that the Coleman stock was acquired by the Security Company and the stock of the Security Company was held by the syndicate. On behalf of the plaintiffs, it is contended that the acquisition of this stock by the syndicate was in fraud of the Powder Company, was in violation of their several duties as its officers, and that the purchase was effected by the syndicate members taking an unfair and unlawful advantage of their position as officers and by an unfair and unlawful use of the credit, good will, and money of the Powder Company. Standing aside for the present, Pierre Du Pont, as to whom there are individual facts and circumstances hereafter discussed, and confining ourselves to the other members of the syndicate, Raskob, Carpenter, Alexis, Irénée, and Lammot Du Pont, let us inquire whether, as officers of the company, the proofs establish they have, in the purchase of the Coleman stock, been guilty of wrongdoing.

In the first place, it will be noted that Coleman Du Pont was the president of this company, and his ownership of this large block of stock had never been considered as a menace to the company. Of Coleman's right to sell to any officer of the company, and of the right of any officer of the company to buy such stock, there can be no question, and unless, therefore, some facts exist which make it inequitable as against the Powder Company and its stockholders for such officers to buy said stock, it is clear that there was no inequity, per se, in these five defendants buying this Coleman stock. For example, the proof shows that the next largest stockholders of the Powder Company were Alfred Du Pont and William Du Pont. Both were directors, vice presidents, and members of the executive committee. Now, it is clear that, if Coleman had made his offer of February 13th to Alfred Du Pont singly, or to Alfred and William jointly, their official relations to the Powder Company would not have prevented them singly or jointly buying Coleman's stock, although such purchase would have given him or them the potential power incident to such increased stock ownership.

We use this simply to emphasize the position that the fact of the syndicate buyers of this Coleman stock being officers of the Powder

Company did not, per se, qualify or take away the right officers of any company have to buy, in large or small quantity, its stock. It is manifest, therefore, that disability on their part to buy the stock must be found, if it exists, in the fact that they made some wrongful use of their position or influence as officers, or such wrongful use of the money, property, or credit of the company, as made it inequitable for them to acquire and hold stock which the company should hold or wished to buy for itself; or, to put it in another form, the facts of their being officers of the company and their bad faith as officers in buying the stock were such as to warrant the court in decreeing them trustees ex maleficio of the stock, and therefore liable to turn the stock over to the company, if it so desired. Do the proofs measure up to that standard?

[2] Now, it is quite apparent that, if the five officers whom we are now considering had had the money to have paid Coleman Du Pont cash for his stock, or if, instead of Coleman accepting notes for substantially six-thirtieths of this stock, he had taken their notes for the whole of the purchase money, there could have been no just charge made of any fraud, bad faith, or breach of duty on the part of these five men, for, so far as those five are concerned, there is no evidence whatever of anything which, at the date Coleman made his offer, qualified their right to buy his stock. And so far as Coleman Du Pont and nearly $6,000,000 of this purchase money, this was just what this syndicate was able to do and did do without in any way making use of the credit of the company, or in any way using or misusing their position as officers. And in point of fact the security Coleman took and extended over seven years was not only on a lesser margin of stock depreciation, but his notes were not secured by the personal guaranties of the syndicate members, which, as we shall see, were given to Morgan & Co. in the case of the remaining $8,000,000 of the purchase money.

We next turn to the steps taken and the notes given by the syndicate, from the proceeds of which were raised the $8,000,000 cash paid to Coleman for his stock; in raising this sum, was the credit of the Powder Company used, or was any misuse made by any of these five men of their official relation to the company? While, of course, they are to be held responsible for what was done by each member or members of the syndicate in their behalf, we are relieved from any detail discussion of the proofs, so far as four members of the syndicate, viz. Carpenter and Alexis, Irénée, and Lammot Du Pont, are concerned; for as to them there is no proof of their personally taking any part in obtaining the $8,000,000 through Morgan & Co.

Assuming, however, that they are responsible for the acts of Raskob and Pierre Du Pont, who acted in their behalf in getting the $8,000,-000, we turn to the proofs of what was done by Raskob and Pierre Du Pont in getting this $8,000,000 of purchase money. Was the credit of the Powder Company used by Raskob and Pierre to obtain the $8,000,000 in New York? Did Raskob or Pierre misuse their official connection with the company to obtain this loan? In this inquiry we note that the arrangement for the loan was made by Raskob;

he alone visited New York, made all the arrangements and he was the treasurer of the company. He reported back to his fellow syndicate members. Now, Raskob was treasurer of the company; he had a general supervision of its treasury, credits, and resources; he was in a position to misuse, and if any misuse was made he was peculiarly in a financial position of trust which enabled him, above all others in the company, to make such misuse. The Powder Company was handling vast sums; the likelihood was that it would handle larger sums; the selection of depositories for those funds and the distribution of funds in the particular banks were all discretionary matters, which put it into the powers of a treasurer to so manipulate and use the funds of the Powder Company as to enable him, if so minded, to obtain personal favor and benefits from those depositories which as an individual he could not obtain.

We have no disposition to minimize or gloss over the high measure of duty incumbent on a man in such a trusted position, and knowing, as these four men, Carpenter and Alexis, Irénée, and Lammot Du Pont, did, as officers of the company, that Raskob had this potential power of wrongdoing by virtue of his treasurership, we are justified in holding these four men responsible for any misuse Raskob made of the official power they knew he had. On the other hand, if Raskob made no misuse of his company's credit or his official position, we see no reason why the fact that his company trusted him should cripple his right, or the right of those associated with him, to buy stock in his own company, and thereby increase the personal interest he and they would have in increasing its prosperity.

Turning, then, to the proofs, let us inquire whether there is proof that Raskob misused, or indeed used at all, the credit of the Powder Company in obtaining the $8,000,000 from Morgan & Co. Now, the proofs affirmatively show that the only dealings Raskob had in making arrangements for the loan were with the banking house of Morgan & Co. in New York. We shall hereafter discuss the close relationship that existed between that firm and the Powder Company. For the present, it suffices to say that Morgan & Co. had given huge contracts for powder to the company. It knew the extent of the company's present business and its prospective business, and in that way was well aware of the value of the company's business and stock. As payments on these powder contracts were made to Morgan & Co. by the European governments concerned, it credited the payments to the Powder Company and notified the Powder Company of such credits, and the latter thereafter then checked out such parts of said deposits as it saw fit. So far as the evidence shows, the relations between the Powder Company and Morgan & Co. were that Morgan & Co. gave the Powder Company contracts for powder and far in excess of any deposits the Powder Company kept with the firm. Morgan & Co. treated the Powder Company just as it did other companies having contracts with the Allies, namely, it credited incoming payments and notified the manufacturer.

It would seem, therefore, that the relations between the Powder Company and Morgan & Co. were the ordinary ones existing with

other companies, that Morgan & Co. were not seeking or liable to have any favors from the Powder Company in the way of deposits, and that, if favor was to be exercised, the party that granted the favor was Morgan & Co., in giving these large contracts to the Powder Company. Moreover, the proofs are positive and uncontradicted that the arrangement made between Raskob and Mr. Porter, one of the members of Morgan & Co., was wholly and entirely on the business basis of the worth of the loan, that Morgan & Co. were paid a broker's commission of 2 per cent. for taking the loan, and that the loan was made on the security given, and not on any present or prospective favors to be done by the Powder Company, by Raskob, its treasurer, or any other officer.   In that regard, Henry P. Davison, a partner of Morgan & Co., testified:

"Q. Will you tell the court what you took into account in making that loan and upon what credit that loan was made?  A. We took into account the parties interested in the loan; that is, the personnel, and the character of the obligation, and the character of the security.  We took into account the character of the people who applied for the loan and the character of the collateral.  *  *  *

"Q. Was there any other consideration or interest moving you to make that loan than the personal character of the men who guaranteed the loan and the collateral which they offered?  A. The terms on which the loan was presented: nothing else.

"Q. And the terms?  A. Yes; nothing else.

"Q. Did the question of the Powder Company having a deposit with your firm enter into this subject in any degree?  A. It did not.

"Q. Did the making of this loan to these gentlemen as individuals impair in any manner the credit of the company for making loans on its own account with you?  A. It did not.  *  *  *

"Q. Was there any understanding, agreement, or arrangement, express or implied, with anybody connected with these gentlemen with reference to making a deposit account with your firm?  A. Not so far as I have ever known.  *  *  *

"Q. State whether or not this loan was made upon the credit of these men and their collateral, or upon their credit and standing as officers of the Powder Company?  A. We regarded this as entirely an individual matter.  It was an unusual transaction, but we had a general knowledge of the situation, and we understood that these men had this opportunity to buy this stock and very materially increase their personal holdings.  It was a personal matter so far as we were concerned; we treated it personally and regarded it as such.

"Q. Then it was absolutely a personal matter as between your firm and them?  A. Entirely.

"Q. Did the making of this loan to these gentlemen in any way affect the credit of the Powder Company that you know of?  A. None whatever, except as it indicated to us the appreciation that the officers themselves had of the company.

"Q. And that would increase rather than diminish?  A. That would be the effect that it would have upon us."

Indeed, the solid self-sufficiency of the Morgan loan is shown, not only by the undisputed testimony of a number of bankers whose testimony was in substance to the same effect as Davison's, but by the attitude of Coleman Du Pont.  The proof shows that the excess margin of the stock given to him as collateral for his $6,000,000 notes was less than in the Morgan loan.  In addition, Coleman gave a credit for 7 years, Morgan & Co. only 18 months, and Coleman had no personal guaranty, while Morgan & Co. had the individual guaranty for

separate portions of the loan in varying amounts from each of the syndicate members which in the aggregate equaled the loan, and the proof is that their individual property was in excess of the amounts so guaranteed. Indeed, the inherent worth of the loan is shown by the fact that it so commended itself to banks amongst which it was distributed that Morgan & Co. were only able to keep for themselves but a small part of the loan, and the attractiveness of the loan to persons who had no connection with the parties or transactions whatever is evidenced by the fact that a bank with absolutely no possible connection with the whole transaction, and without solicitation, asked for and took $150,000 of it. In that regard Clark, the president of the American Exchange National Bank of New York, testified:

"Q. To what extent did you participate in this [loan]? A. In the first instance, $600,000, and later on $150,000 more.

"Q. How did you come to take $150,000 more? A. I mentioned the question of the loan to some of our correspondents, and they thought so well of it that they asked if I would not get some for them, and I asked for an additional $150,000.

"Q. Upon what did you, representing your bank, take this loan, or participate in this loan? A. On the strength of the collateral and personal knowledge of the men behind it.

"Q. Through whom did you come to participate in this loan? A. Messrs. Morgan & Co.

"Q. Had either John J. Raskob or Pierre S. Du Pont anything to do with placing the loan with you? A. No.

"Q. Had they spoken to you about taking it all? A. No.

"Q. Was there any arrangement with your bank in any way or shape, directly or indirectly, in regard to bank balance, or the maintaining of a bank balance, on the part of the Du Pont Powder Company? A. No.

"Q. Was the borrowing credit of the E. I. Du Pont de Nemours Powder Company affected in any way by this loan made to these gentlemen? A. Absolutely not.

"Q. Was the credit increased—was the credit of the company affected in any way? A. It was strengthened. * * *

"XQ. What had you known of the past operations of the company? A. The company had banked with us for a great many years. From time to time we had seen their statement, and noted the growth, the most wonderful growth."

The intrinsic worth of the loan, that it was taken by banks on that basis, and not on account of the offices Raskob and his associates filled, that the credit or resources of the company were not used by the syndicate, these and other convincing facts are proved by the testimony of numerous witnesses, and there is no evidence to the contrary. In that aspect we quote the testimony of Levi L. Rue, president of the Philadelphia National Bank, who said:

"Q. Did your bank participate in this $8,500,000 loan that was made? A. We did.

"Q. Through whom did you participate in this loan? A. J. P. Morgan & Co., New York.

"Q. Had you anything to do with either Pierre S. Du Pont or John J. Raskob in the negotiation of that loan or arranging to participate? A. None whatever.

"Q. Upon what did you make the loan, so far as your bank was concerned? A. *On our faith in the integrity and worth of the promisors and the collateral which they gave.*

"Q. Was there any other consideration that entered into it? A. None whatever.

"Q. Was there any promise or suggestion of any balances or anything to be kept in your bank in connection with it? A. None whatever.

"Q. Did the making of this loan to these gentlemen in any way impair the borrowing capacity of the company itself? A. It rather increased it, because in our judgment it strengthened the credit of the company, because it showed the faith of the officials themselves in the corporation by their purchasing its stock."

The testimony of Leroy W. Baldwin, president of the Empire Trust Company of New York, was:

"Q. I ask you to look at this paper and say whether or not your company participated in that loan. A. We did.

"Q. Through whom did you participate in that loan? A. J. P. Morgan & Co.

"Q. Did either Mr. Pierre S. Du Pont or John J. Raskob come to see you or talk with you about participating in that loan? A. No.

"Q. On what did you participate or permit your company to join in the making of that loan? A. *Because we considered it a good loan and it was presented by Morgan & Co.*

"Q. Was there any arrangement made by anybody with you with reference to the deposits of the Powder Company in your trust company in connection with this loan? A. There was not.

"Q. Had the deposits in your company anything to do with the making of this loan? A. No; it had not.

"Q. Was the credit of the Powder Company injured or helped by the making of this loan? A. I have never given it a thought. It was not injured."

George F. Baker, Jr., vice president of the First National Bank of New York, testified:

"Q. Did your bank participate in the loan made to the Du Pont Securities Company upon the collateral mentioned in that note and the guaranty of the persons who signed the annexed agreement? A. We did.

"Q. Through whom did you come to participate in that loan? A. Messrs. J. P. Morgan & Co.

"Q. Did either Pierre S. Du Pont or Mr. J. J. Raskob have anything to do with your participating in that loan? A. No.

"Q. Upon what did your banking institution extend or participate in this loan? A. Do you mean upon what credit?

"Q. Yes. A. Upon what security we had there?

"Q. Yes. A. Upon the security of the stock that was their collateral and upon our impression of the worth of the guarantors.

"Q. Is the Powder Company a depositor in your bank? A. It was.

"Q. I mean at that time? A. Yes.

"Q. Did the question of the deposits in any way come up or be connected with the making of this loan? A. No; not at all.

"Q. Had the keeping or the maintenance of any size of deposit anything to do with participation in this loan on your part? A. A comparison between the size of the deposit and the amount that we loaned would make it appear that the deposit had nothing to do with it.

"Q. This was not a loan to the Powder Company, was it? A. No.

"Q. It was a loan made to the Du Pont Securities Company, with the guarantors' collateral, was it not? A. Yes.

"By Mr. Johnson: That is leading.

"By Mr. Graham: Q. Was there any agreement or understanding made by anybody in connection with this loan concerning the deposits that were to be kept or maintained in the First National Bank of New York? A. Not at all.

"Q. Would the making of this loan to the Du Pont Securities Company, with the indorsement of these gentlemen, upon this collateral, in any wise affect the borrowing credit of the Powder Company? A. Not at all.

"Q. How much of the loan did your bank take? A. Seventeen hundred thousand dollars.

"Q. One million seven hundred thousand dollars?  A. Yes, sir.

"Q. Do you happen to know how much the deposits were in your bank?  A. For about four years previous—I looked it up before I came here—they were about $20,000 a month, and they ran up to about $60,000, and I think they were about that on the day that we made the loan.

"Q. Sixty thousand dollars?  A. Yes."

The Bankers' Trust Company of New York, at the request of Morgan & Co., acted as trustees in taking the loan from the syndicate and distributing it among the banks in the proportions directed by Morgan & Co. The testimony of Seward Prosser, the president of the trust company, in that regard, was:

"Q. Do you recall this loan of $8,500,000 that was made to the Du Pont Securities Company?  A. I do.

"Q. How did that loan come to your institution—from whom?  A. J. P. Morgan & Co.

"Q. Did Pierre S. Du Pont or John J. Raskob, or any of his associates, have anything to do with bringing it to your company?  A. No.

"Q. What was your company's relation to the loan?  What was their position?  A. We were a participant in the loan, and we acted as trustee for the securities, and we also cleared the transaction on behalf of the Morgans.

"Q. Did you ever see that exhibit before?  A. This is the original note. I have seen it before.

"Q. And this is the original guaranty that accompanied that note?  A. It appears to be; yes.

"Q. Please tell the court in what way you cleared that loan for the Morgans.  A. The Morgan firm asked us to clear the transaction, as we were the trustees. They gave us the names of the people who had accepted participations, and advised us, when we split the loan up in accordance with their instructions, to send participation receipts to the institutions who had participated after we had received their remittances.

"Q. Did the participation receipt recite this note and the collateral?  A. I do not recall that it recited that note verbatim, but it recited all the salient points necessary for a lender to know to understand the transaction.

"Q. What number of shares of stock were pledged behind this loan?  A. I cannot recall.

"Q. Can you refresh your memory from the original paper?  A. 54,591 shares common and 14,599 shares preferred.

"Q. What did the loan mark the stock down to, and what percentage of margin had you on the loan?  A. My recollection is that, taking the common stock at 135, we had then a margin of 50 per cent. on the loan.  In other words, we had the amount of the loan and a margin of 50 per cent. in excess of that.

"Q. Did you make any inquiry into the standing of those who guaranteed the loan?  A. Yes, to this extent: I talked with Mr. Raskob and with Mr. Pierre Du Pont.  My recollection of the conversation is that Mr. Du Pont said that the guarantors to that loan in his judgment were worth $10,000,000 and that the amount of their respective guaranties was appropriate to their means.

"Q. You say your trust company participated in the loan?  A. Yes.

"Q. To what extent?  A. I think it was something over $1,700,000.

"Q. Was your company one of the depositories of the Powder Company?  A. Yes.

"Q. Did the fact of the deposit of the Powder Company in your company have any connection whatever with the making of this loan, so far as you were concerned?  A. None whatever.

"Q. Upon what was this loan made, so far as you and your banking house were concerned?  A. It was made on the belief that the collateral to the loan was adequate and that the people who guaranteed it made it still safer. We believed in them personally.

"Q. Was there any agreement of any kind made by anybody, or did you understand or hear of any agreement, to maintain deposits in any of the participating banks? A. I never heard of any such suggestion.

"Q. Did any such idea or suggestion enter into the extension of this credit? A. None whatever.

"Q. Was the borrowing credit of the Powder Company in any way affected by the making of this loan to the Securities Company, with these guarantors and upon this collateral? A. Not at all. As a matter of fact they had no borrowing arrangement with us. The Bankers' Trust Company not being a commercial bank, they do not have such arrangements.

"Q. Do you know Mr. Porter, of J. P. Morgan & Co.? A. Very well.

"Q. Did you have any interview with Mr. Porter about this matter? A. Yes.

"Q. What instructions did Mr. Porter give you, if any, or what information did he give you, if any? A. My recollection is I had one discussion with Mr. Porter while this loan was pending, in which I told him my belief that the loan was excellent and should be made. Subsequently I had a talk with him when Mr. Raskob was present, when they gave me the details of the transaction and requested that our counsel get all the trust matters in correct shape, and Mr. Porter handed me a list of the participants and asked us to clear the transaction.

"Q. In that conversation between you and Mr. Porter, was anything said about bank deposits being made with any of the participants? A. No.

"Q. Was anything said upon that subject? A. No suggestion."

The testimony of Albert H. Wiggins, president of the Chase National Bank of New York, was:

"Q. Did your bank take any of the participating receipts in connection with this loan of $8,500,000 to the Du Pont Securities Company of Delaware? A. It did.

"Q. How much did your bank take? A. $500,000.

"Q. Upon what did your bank extend its credit of $500,000 and take this participation in the loan? A. Upon the value of the collateral as we believed it, and upon the standing and reputation of the guarantors.

"Q. Did anything else enter into the taking of this loan besides those two things? A. No, sir.

"Q. Was the Powder Company a depositor with your bank? A. It was.

"Q. Do you recall, or can you recall, about what the deposits were at that time? A. I have no idea.

"Q. Did the fact of the Powder Company being a depositor in your bank affect your judgment in any way, or influence you in any way in taking this loan? A. No, sir.

"Q. Did this extension of this loan, or participation in this loan, affect the borrowing credit of the Powder Company in any way? A. No, sir.

"Q. Who brought the matter to your attention as a bank? A. J. P. Morgan & Co.

"Q. Did it, or not, come to you in any way through Pierre S. Du Pont or John J. Raskob? A. It did not.

"Q. Was there any promise, agreement, or understanding of any kind made by anybody in connection with this loan, with respect to deposits or maintenance of deposits in your bank? A. There was not."

Gilbert G. Thorne, vice president of the National Park Bank, testified as follows:

"Q. Did your bank participate in this loan of $8,500,000 made to the Du Pont Securities Company of Delaware? A. Yes.

"Q. To what extent did they participate? A. $375,000.

"Q. Did you pass upon this participation? A. Yes; I took the loan.

"Q. Upon what did your bank extend this credit and take this participation in this loan? A. Upon the fact that it was presented, first of all, by J. P. Morgan & Co., and then by the value of the security as it was represented to

us, and then by what we were told subsequently as to the value of the indorsers or the guarantors.

"Q. Through whom did you become a participant in this loan? A. Through J. P. Morgan & Co.

"Q. Did either Pierre S. Du Pont or John J. Raskob ask you to become a participant in the loan? A. No, sir.

"Q. Was the Powder Company a depositor with your bank? A. Yes.

"Q. Did the fact of the Powder Company being a depositor in your bank influence or affect your judgment with reference to the making of this loan? A. Not at all."

The testimony of Robert G. Hudson, Jr., vice president of the National Bank of Commerce of New York, is as follows:

"Q. Did your bank take any part of this loan of $8,500,000, made through Morgan & Co. to the Du Pont Securities Company of Delaware? A. It did.

"Q. How much? A. $250,000.

"Q. How much did you become interested in the loan; through whom? A. J. P. Morgan & Co.

"Q. Did you become interested in it in any manner through Pierre S. Du Pont or John J. Raskob? A. No, sir.

"Q. Was the Powder Company a depositor with your bank? A. It was.

"Q. Do you know, or not, as to what the amount of deposits were at the time of this loan? A. I do not.

"Q. Did the question of the deposits of the Powder Company in any manner affect your judgment or influence you with reference to this loan? A. Not at all.

"Q. Upon what did your bank extend the credit of $250,000 in this participation? A. Based on the collateral and the character and standing of the men that guaranteed it.

"Q. Was there any agreement that you heard of from anybody, with reference to deposits or the maintenance of deposits by the Powder Company in your bank, or in any of the other participating banks? A. There was not."

And finally Richard H. Higgins, vice president of the Chatham & Phœnix National Bank, testified as follows:

"Q. Did your bank participate in this loan of $8,500,000 through Morgan & Co. to the Delaware Securities Corporation? A. Yes, sir.

"Q. To what extent? A. Our limit, $300,000.

"Q. Did you pass upon this loan? A. Together with the president, yes.

"Q. Through whom did you become a participant? A. J. P. Morgan & Co.

"Q. Did either Pierre S. Du Pont or John J. Raskob, or any of their associates, ask you to become a participant? A. No, sir.

"Q. Was the Powder Company at that time a depositor in your bank? A. Yes.

"Q. Did the fact of the Powder Company being a depositor in your bank affect your judgment or that of the president in passing upon this loan? A. Not at all.

"Q. Was there any agreement or any understanding, expressed or implied, made anybody with reference to the maintenance of deposits in your bank as a condition or circumstance connected with this loan? A. No.

"Q. Upon what did your bank extend credit in this participation? A. On account of the collateral, the price that the collateral was put into the loan, on account of the character of the men who guaranteed the loan in their respective proportions, and on account of the fact that J. P. Morgan & Co. was handling all of the details and investigated it."

Without citing further proofs and facts as to the intrinsic and self-recommending value of the loan, we may add that, while necessarily its worth was enhanced by the relation of the syndicate to the company, yet that enhancing value was an incident which attaches to

every stockholder who has a large part in the executive work of a successful company. If, for example, William Du Pont, occupying, as he did, the important place of a vice president in this company, had desired to purchase a large block of Coleman's stock, and had offered the purchased stock as part of his security for a loan to enable him to raise the purchase money, the very fact that he was a trusted officer of the company whose stock he was buying, that he had full knowledge of its affairs, and was already largely increasing his holdings, in and of itself would naturally reassure the lender and strengthen his confidence in the value of the stock of the company which he was taking as security. And, indeed, the bona fide purchase of stock in a company by those concerned in its management strengthens confidence in the company, as Mr. Davison testified in this case. But this fact, in and of itself, cannot and should not preclude one active in the management of a company from buying stock in his company, from obtaining money to buy it, or compel him to forego that additional confidence inspired in the lender by the fact that his purchase of his own company's stock had a financial weight that the purchase of the same stock by a stranger to the company might not have.

Under the proofs in this case, we are clear that, while the value of the Powder Company's stock was, in the nature of things, strengthened in the eyes of the lenders by the fact that these men, who were connected with the company, were purchasers, and to that extent their official position was a makeweight in the eyes of the lender, yet we are satisfied from the proofs that it was a mere incident, and not the real basis, on which the loan was made. And we are further satisfied from the proofs that the credit of the Powder Company was not used or its borrowing power diminished by the purchase of the stock or the loan which made the purchase possible. On the contrary, the proof, as we have seen, is that the purchase, instead of lessening, tended to increase, the credit of the Powder Company in banking circles. Taking the proofs as a whole, we are clear, therefore, they fail to show any reason why Raskob, Carpenter, and Alexis, Irénée, and Lammot Du Pont did not have, and were not free to exercise, the same right that any other person concerned in the management of the Powder Company had to buy stock in the company, and that in raising the funds to pay for the Coleman stock they made no use or misuse of the Powder Company's credit or resources, or of their position as officers. Whatever may have been the facts, whether they knew of any facts, circumstances, or relations in reference to Coleman's stock, or any part of it, or of any negotiations the executive committee had theretofore had with Coleman as to a part of this stock and to which we shall hereafter refer, certain it is that there is no proof in the case which shows that these five men, or either of them, had notice or knowledge of such matters. Such being the case, we are not only justified, but indeed constrained, to find that, so far as they are concerned, there is no proof of facts which would warrant the court, if they alone were involved, in depriving them of the

benefits of a purchase they had a right to make personally and did make personally.

[3] But the case does not end with, or depend on, their isolated and personal relations to the sale. Their purchase was not a purchase of segregated shares for individual ownership, but was a joint one for a common purpose and a common ownership, and that joint purchase is now the subject of equitable scrutiny in a court of equity. And inasmuch as the syndicate was formed, the common purpose out-lined, and the purchase made by Pierre Du Pont, its sixth member, and inasmuch as the individual rights of Pierre cannot well be disasso-ciated from the other members of the syndicate, and as they have joint-ly united in submitting their purchase to the judgment of their fellow stockholders, as a joint undertaking, we shall consider the case on the basis of treating the syndicate as a whole, and therefore charg-ing it with notice of all prior matters which affected the rights and equities of the Powder Company, and which were known to, or par-ticipated in by, Pierre Du Pont, the sixth member of the syndicate. Such being the test, let us examine the proofs on the basis that Pierre Du Pont alone, instead of the syndicate, was the buyer of the Cole-man stock, and from that status ascertain whether, at the time Pierre made the purchase, any fact, circumstance, relation, or obligation ex-isted which forbade his doing so; or if the purchase, when made, obligated Pierre, and enabled the Powder Company, to regard the purchase as made for it. In following this course, we adopt the sug-gestion of plaintiff's counsel, who themselves have stated the issue here involved as follows:

"If a director and officer of a corporation, in the course of a negotiation with which he is intrusted, for the purchase by the corporation for a special purpose of a large portion of the stock of one of the stockholders, receives a general offer by that stockholder to sell all the latter's stock, can such director and officer form a small syndicate of himself and a few other officers, and purchase the stock for their own benefit, without reporting the offer to the company and giving it the opportunity to purchase?"

The answer to this question involves a study of the testimony as a whole, and to such task we now address ourselves.

In December, 1914, Coleman Du Pont was then, as we have also seen, and he continued to be on February 13th, when he made the offer which we have above considered, the president of the Powder Com-pany and its largest stockholder, owning, at that time, all the stock, viz. 13,899 shares of preferred and 63,214 shares of common stock, which he subsequently sold to the syndicate. The proofs are that about that time Coleman went to the Mayo Hospital in Minnesota to undergo a serious operation, and the correspondence shows there were apprehensions as to its outcome. The Powder Company had in hand and in view tremendous operations growing out of the war, and Mr. Du Pont was deeply interested in strengthening the company by in-creasing the stock interest of the men on whom it depended to carry this great work through successfully. This policy was one the com-pany had itself followed by awarding as a bonus to its employés, the

right to purchase shares of its stock which the company bought for such bonus purpose or issued from its treasury stock. Coleman's plan to thus sell to the company some of his own stock for distribution among its employés was approved by Alfred Du Pont, who was a vice president, a member of the board of directors and of the finance committee, and who, next to Coleman, was the largest shareholder of the company. It was, as appeared from the proofs, likewise discussed by Coleman with Pierre S. Du Pont, who was also a vice president, director, and member of the finance committee, and he also approved thereof. It would also appear from the proofs that, prior to his going to Minnesota, Coleman had been spoken to by some of the other leading men of the company as to whether he would sell some of his stock, and he was anxious to give them an early answer, and it is also clear, from the references here and there in the correspondence, that Coleman was somewhat apprehensive that some of its leading men might leave the service of the company. At all events, Coleman, Alfred, and Pierre all concurred in the general desirability of the company acquiring stock from Coleman, not for the company itself, but for the express purpose of enabling certain of its employés to buy it. Indeed, there was no talk or suggestion at that time of the company buying any of this stock for investment, profit, or for any other purpose than the one above indicated, and it is quite clear, also, that Coleman had no thought of selling to the company, but his whole purpose was to attract leading men in the company to buy the stock at a price he regarded as under its value, and thus strengthen the company and the 57,000 shares of stock which he would still own.

Before leaving for Minnesota, Coleman, on December 7, 1914, wrote Pierre as follows:

"Dear Sir: As you know, I have always felt those in responsible positions in our company should be encouraged to become importantly interested in the common stock, and I have, as you know, always thought well of the common stock and put a higher figure on it than you have. I think it well worth 185 to-day. and think it will go to 190 or 200 before the year 1915 is many months old. This ownership of common stock by the leading men is of so much importance to the company that as a member of the finance committee (the company having cash away beyond its requirements) I would recommend the funds needed to carry the stock for these men be advanced by the treasury.

"I am willing to sell for the purpose 20,000 shares at $160 per share ex dividend, payable in say 30 or 60 days. To guide me I should like to have a suggestion from the finance committee, or a committee appointed by them, as to how it should be distributed. Inasmuch as important men associated with us have asked me to sell them some stock, I should like to have a prompt answer from the finance committee to enable me to reply.

"If the important stockholders in Hercules Powder Company think well of the plan, make a similar offer to president of Hercules Powder Company, except the number of shares will be much smaller, say 4,000, and I think and hope you gentlemen feel the important stockholders in that company should recommend to the directors of that company that the Hercules Company advance the cash needed as the company can spare it to enable the directors and those they suggest) to secure this stock. The same, with much reduced number of shares, 700 or 800, to the president of the Atlas Company.

"I attach a copy of letter I was going to write to president of the Hercules and Atlas Companies, but before sending same would appreciate any suggestions you gentlemen care to make."

Pierre subsequently told Alfred Du Pont of the fact of Coleman's offer and his plan for the Powder Company, and also for the Hercules Company, who at the time approved of the purchase of the stock and its distribution among the principal men of the company, but desired to consider further as to the price. The testimony of Alfred in that regard was:

"Q. You say you learned as to the sale of Mr. T. C. Du Pont's stock, or part of it, through some suggestion from Mr. P. S. Du Pont. Where was it you heard it? A. In my office in the Du Pont Building.

"Q. What took place there? A. Mr. P. S. Du Pont informed me that he had received a letter, or that he had received information, from Mr. T. C. Du Pont to the effect that he desired to sell 20,000 shares of his stock to the Powder Company at $160 a share ex dividend, for the purpose of redistributing this stock among some of the company's more important employés.

"Q. Did you consider the matter with Mr. Pierre Du Pont then? A. I discussed it for a few minutes.

"Q. Did you reach any conclusion? A. No conclusion, other than I agreed with him. * * *

"Q. What was said by you and what was said by P. S. Du Pont as to the question of the advisability of the purchase? What was said by you in that meeting with P. S. Du Pont, and what was said by him as to the advisability of making the purchase? A. He said that he thought it would be an excellent thing to make the purchase.

"Q. What did you say? A. I said I thought so, too, so far as purchasing the stock and redistributing it among employés. The only question I wished to consider was upon the price; that it involved a large investment on the part of the company."

Thereafter Alfred evidently gave further consideration to the question of price, which, as we see, involved an outlay of $3,200,000, and decided the price asked—$160—was too high, and that no decision as to the price should be given until the finance committee met. This conclusion he embodied on December 14, 1914, in a letter to Pierre as follows:

"Dear Sir: After giving the question of purchasing a certain large block of Du Pont common further consideration, I believe that 160, the price you talked of, is too high, 150 would be purchasing it on a 6 per cent. basis, and 160 a 5 per cent. This is too low a rate for the company to invest its spare funds, and furthermore, if it were offered to any of our employés, it would not be sufficiently attractive at that price. I see no objection to the company's purchasing this stock, but the question of price is one of grave importance, owing to the large investment. I would suggest that no decision as to the actual price be given until present owner until the finance committee has had ample time to think the matter over and discuss it together.

"Yours truly, Alfred I. Du Pont, Vice President."

In a subsequent letter to Pierre, dated December 21st, Alfred called attention to the mistake made in stating the stock at 150 would yield 6 per cent., and says 150 should read 133, and then adds:

"I doubt whether the investment of the company's surplus earnings by the finance committee on a basis even as high as 6 per cent. could be justified. In other words, if the company is unable to invest its surplus earnings at a rate better than the stockholders might themselves, they might contend that these earnings should be distributed in the form of a dividend."

As noted in Coleman's letter, he desired an early answer, and instead of the offer going over until December 30th, as Alfred suggested,

it was brought up at a finance committee meeting on December 23d. This change of meeting day was evidently made to comply with Coleman's suggestion in a letter he wrote on December 14th, for it appears that Pierre, having received Coleman's letter of December 7th, made for Coleman a schedule of the employés for whom the stock purchase was to be made. In that regard, Pierre testified:

"A. At the time of the original interview I suggested to T. C. Du Pont that I make a memorandum of the *principal men in the company who would be recognized* in suggesting distribution of the stock to the employés. I made that memorandum and handed it to him; and from that memorandum it appears that the allotment of stock to the executive committee by T. C. Du Pont, plus three times the annual salary of the men receiving $500 per month or more added up to 20,700 shares."

Thereupon Coleman enlarged his offer of 20,000 to 20,700 shares by his letter of December 14th, as follows:

"Dear Sir: I have given a great deal of thought to my letter of December 7th as to the distribution of this stock, and my judgment is that each member of the executive committee be allowed 1,500 shares; that the men whose salary is $500 a month and over will be allowed to subscribe for three times the amount of their salaries. This makes a total, according to the memorandum you left with me, of 20,700 shares. I am willing to furnish the other 700, or the company can do this, as in your judgment seems advisable.

"I suggest you make this announcement some time prior to the 23d of this month, as I think it has some advantage. As I am going away to-day, and do not know how long I will be gone, I have left the matter in Mr. L. L. Dunham's hands. He can come to Wilmington and see you upon receipt of telegram from you."

This letter was written on December 14th, but there is no testimony on Alfred's part that prior to the meeting of the finance committee, on December 23d, this letter was shown to him, or that he knew of the change Coleman had made from 20,000 to 20,700 shares, or that Coleman had left the matter in charge of L. L. Dunham. Up to December 23d there is practically no dispute as to what was done, or what was the attitude of Alfred and Pierre toward Coleman's offer. The matter was brought up at the meeting of the finance committee on December 23d, which meeting was attended by Alfred, Pierre, and William. As the present phase of the case largely turns on conflicting oral testimony as to what took place at this meeting, it should be noted that we have written evidence in the minutes of the meeting—evidence of substance, when men's recollections differ as to events. Turning first to the written evidence, we find the minute of the finance committee. It reads as follows:

"Purchase of Common Stock Owned by Mr. T. C. Du Pont.

"Mr. P. S. Du Pont presented a letter from Mr. T. C. Du Pont, offering to sell 20,700 shares of common stock of this company at $160 per share. After discussion it was moved and carried (Mr. P. S. Du Pont voting in the negative) that Mr. P. S. Du Pont be instructed to advise Mr. L. L. Dunham, attorney for Mr. T. C. Du Pont, that we do not feel justified in paying more than $125 per share for this stock."

The proof is that the resolution referred to was made by Alfred Du Pont. The minute is attested by the signature of Alfred, Pierre

and William, and as to its legality by J. P. Laffey, the counsel of the Powder Company. There is some testimony to the effect that the minute was not wholly correct, and in that regard, and as to what occurred at the meeting, we quote the testimony of the three men present. Alfred's account is as follows:

"Q. Did you offer that resolution? A. I offered the resolution, but it is not correct, as I remember it.

"Q. Did you write it out yourself? A. No; I did not.

"Q. How was it offered by you? A. I offered it orally.

"Q. Was there a stenographer there to take it down? A. A stenographer, the secretary of the committee, took it down. * * *

"Q. What words, if any, which you embraced in the resolution, as you offered it, are lacking from the resolution as it appears on this minute book? A. The words should have been 'at this time,' or 'at the present time.'

"Q. Those words were included in the resolution as offered by you? A. So far as I remember, they were.

"Q. Did you have any conversation with Mr. P. S. Du Pont relative to the question of what he should say to Mr. Dunham when he reported the action of the finance committee? A. At that meeting?

"Q. Then or thereafter? A. I suggested, after the resolution had been passed, that in conveying this information to suggest to Mr. T. C. Du Pont that, if he should keep the offer open a month or two longer, we might be able to increase the price offered for the stock.

"Q. You told Mr. P. S. Du Pont that? A. I did.

"Q. Who was Mr. Dunham? A. Mr. Dunham was Mr. T. C. Du Pont's representative and secretary. * * *

"Q. When did you first discover that the resolution as it appeared on the minute book lacked the words 'at this particular time,' or 'at the present time'? A. I do not remember.

"Q. Was it immediately after the meeting, or some time thereafter? A. Some months afterwards."

The testimony of William Du Pont was:

"Q. You say that you were present at a meeting of the finance committee in which the suggestion of Mr. T. Coleman Du Pont as to the sale of 20,700 shares of stock of the company was considered? A. I was present at the meeting when that was considered. * * *

"Q. Please state what attitude or position Mr. Pierre S. Du Pont took on that subject of the purchase. If you can do so, give us what Mr. Pierre S. Du Pont stated as to his view about it. A. I think he advocated the purchase of the stock. I am not sure.

"Q. State what Mr. Alfred I. Du Pont stated as his view about it, and when you stated as your view? A. Mr. Alfred I. Du Pont advocated the purchase of the stock at a certain price.

"Q. What was that price? A. $125 a share.

"Q. What was your attitude? A. That was my attitude, too.

"Q. Was a resolution offered at the meeting to which you refer on that subject? A. I believe there was.

"Q. Who offered it? A. I think it was offered by Mr. Alfred I. Du Pont.

"Q. Was it verbal? A. Verbally offered.

"Q. I call your attention to the minutes of the meeting of December 23d, and read to you the resolution as appears there as follows: 'Mr. P. S. Du Pont presented a letter from Mr. T. C. Du Pont, offering to sell 20,700 shares of common stock of this company at $160 per share. After discussion, it was moved and carried (Mr. P. S. Du Pont voting in the negative) that Mr. P. S. Du Pont be instructed to advise Mr. L. L. Dunham, attorney for Mr. T. C. Du Pont, that we do not feel justified in paying more than $125 per share for this stock.' Does that resolution correctly set forth what took place at that meeting with reference to the presentation by Mr. P. S. Du Pont of a letter

on that subject? A. I do not remember any letter was presented; that is to say, there was no letter given to the board to read.

"Q. Did you see any letter? A. I did not see any letter.

"Q. I read you further: 'After discussion, it was moved and carried (Mr. P. S. Du Pont voting in the negative) that Mr. P. S. Du Pont be instructed to advise Mr. L. L. Dunham, attorney for Mr. T. C. Du Pont, that we do not feel justified in paying more than $125 per share for this stock.' Does that resolution correctly recite what was the action taken by the committee at that time? If not, in what way? A. It is partially correct, but the word 'now' is left out, as I remember it, or 'at this time.'

"Q. You mean at what part of the resolution would that come? A. After the offer of $125 per share.

"Q. 'That we do not feel justified in paying more than $125 per share now'? A. 'That we do not feel justified in paying more than $125 per share for this stock now.' That is my recollection of it, or 'at this time.'"

On cross-examination he testified further:

"XQ. How did you learn the nature and character of the offer made by Mr. T. C. Du Pont of the stock at that time to the finance committee or to the company? A. From statements made by Mr. P. S. Du Pont.

"XQ. Will you say that those letters were not produced at that finance committee meeting from T. C. Du Pont? A. There was no letter put on the table at that meeting.

"XQ. Were they not produced and commented upon? A. I do not understand what you mean by produced.

"XQ. The word is a simple English word. I will have to ask you to say whether they were produced there at the meeting in your sight or presence at all? A. I saw no letter or letters from Mr. T. C. Du Pont. I do not say Mr. P. S. Du Pont might not have had them, but he did not produce them in the sense you mean, by putting them down on the table for members of the finance committee to read or look at.

"XQ. Did you ask to see them? A. I cannot say I did. I do not recall.

"XQ. This was a transaction involving upward of $3,000,000, was it not? A. It might have been.

"XQ. Do you not know whether it did or not? A. Yes.

"XQ. Did it? A. Yes.

"XQ. And you did not look at the offer that was made by the man who presented this to the finance committee? A. There was no paper placed on the table for any member of the finance committee to read or look at. If it had been placed there, I would have looked at it.

"XQ. I ask you whether you did not see the letter? A. I did not.

"XQ. At any time? A. At no time.

"XQ. You were content with the statement made by Mr. P. S. Du Pont of what was in the letters? A. Yes.

"XQ. And you understood from his statement that that was an offer to the company of 20,700 shares to be distributed among employés, for the purpose of more importantly connecting them with the corporation, and along that line of policy, did you not? A. I believe so.

"XQ. And that it was not an offer of the sale of stock to the company, but an offer of stock to be used to distribute among the employés, out of which the company would receive no profit. That you understood, did you not? A. I think it was an offer of sale of stock to the company, to be bought by the company and distributed to employés.

"XQ. But the company was not to profit by it? It was to go to employés at the price paid for it? A. It might be."

The testimony of Pierre as to the minutes and the meeting is:

"Q. Were you present at the meeting of the finance committee on December 23, 1914? A. I was.

"Q. (Minutes of meeting of finance committee held December 23, 1914, handed to witness.) Is that the signature of Mr. Alfred I. Du Pont? A. Yes.

"Q. Who were present at that meeting? A. Alfred I. Du Pont, William Du Pont, and myself, members of the committee, and Mr. Fisher as secretary.

"Q. The minutes recite that you presented two letters of T. C. Du Pont for the consideration of the committee. Were those letters presented at that meeting? A. My recollection is that they were at the meeting.

"Q. Were the contents of the letters discussed at that meeting? A. They were.

"Q. I call your attention to the resolution which was adopted, and I wish you to say whether or not that resolution is correct as it there appears—whether the minutes present a correct statement of the resolution as it was offered, voted on, and adopted? A. That is correct as it stands.

"Q. Mr. Alfred I. Du Pont says that there are some words omitted at the end, 'now,' or 'at the present time.' What is your recollection as to whether or not such words were embodied in that minute? A. My recollection is that the minute is correct as it stands; that there were no words 'at this time,' or the equivalent.

"Q. And you signed these minutes as correct at that time? A. I did.

"Q. About how long after, do you remember, the meeting, were the minutes presented to you for your signature? A. Within a week or ten days.

"Q. Who prepared the minutes and presented them for signature? A. Mr. Fisher was the secretary of the meeting. So far as I remember he prepared the minutes.

"Q. Mr. Alfred I. Du Pont says that at that meeting, after the adoption of this resolution, he said to you, 'In reporting this, try and have T. C. Du Pont keep it open for a month or two.' Was anything of that kind said to you at that meeting? A. I have no such recollection. I am sure I had no such instruction.

"Q. At that meeting state to the court what your position in regard to this resolution was, and what was the position of Mr. Alfred I. Du Pont and Mr. William Du Pont. A. I stated that I believed the plan of selling this stock to the employés was a very good one, to have them interested in the company. I advocated the purchase or the financing of the purchase of the stock by the company for the employés, and also advocated the paying of $160 a share, the offered price. Mr. Alfred I. Du Pont took the opposite view, that $160 a share was too much for the company to pay, and was too much to attract the employés, calling attention to the fact that $160 a share was too low a rate of return, in view of the dividend of 8 per cent., which was then being paid. He expressed his opinion that the investment would not be attractive, either to the company or to the employés, at less than 6½ per cent. basis, and therefore he suggested $125 a share as being a limit of the price to be paid. Mr. William Du Pont assented to that idea, as I remember, but he did not express himself quite as freely as Mr. Alfred I. Du Pont, but he assented to Mr. Alfred I. Du Pont's ideas.

"Q. Was this proposal of T. C. Du Pont confined to the Powder Company, or was it coupled with a proposal to the Atlas and other companies at the time? A. He made a similar proposal to the Atlas and Hercules Companies. These proposals are referred to in his letter of December 7th, or the one of the 14th.

"Q. Do you know whether or not his proposal was accepted and acted upon by each of those companies? A. I believe that they were."

In addition to the oral testimony, there is the written evidence of the minute itself, which reads as follows:

"Purchase of Common Stock Owned by Mr. T. C. Du Pont.

"Mr. P. S. Du Pont presented a letter from Mr. T. C. Du Pont, offering to sell 20,700 shares of common stock of this company at $160 per share. After discussion, it was moved and carried (Mr. P. S. Du Pont voting in the negative) that Mr. P. S. Du Pont be instructed to advise Mr. L. L. Dunham, attorney for Mr. T. C. Du Pont, that we do not feel justified in paying more than $125 per share for this stock."

Two members of the finance committee, Alfred and William, being adverse to the proposition, under the by-laws or rules of the Powder

Company, the subject-matter would not come before the board of directors for consideration or action otherwise than that the negative action of the finance committee would be reported to the board meeting. Such report was formulated December 24th, and was reported to the meeting of the board of directors held December 30th, and was as follows:

"Purchase of Common Stock.—An offer was received from Mr. T. C. Du Pont to sell 20,700 shares of the common stock of this company at $160 per share. The committee expressed the feeling that we are not justified in paying more than $125 per share for this stock, and asked Mr. P. S. Du Pont to take the matter up with Mr. T. C. Du Pont further."

It will be noticed, in passing, that the members of the finance committee, as recorded, instructed Pierre Du Pont to notify Dunham, the attorney of Coleman Du Pont, and its report to the board of directors requested Pierre to take up the matter further with Coleman Du Pont himself. The action of the board of directors on this report was embodied in the resolution in its minutes as follows:

"Resolved, that the action taken by the finance committee from November 19 to December 23, 1914, inclusive, be approved, ratified and confirmed."

At this point we stop to observe that, laying aside, for the present, the large mass of testimony as to subsequent events confirmatory or contradictory of the two parties, final analysis shows that the oral and written testimony, above quoted, summarize the basic questions on which the right of action of the Powder Company, attempted to be enforced in this bill, must, in final analysis, depend. Those questions may be summarized as follows:

First. Was Coleman's offer to sell to the Powder Company itself, or to the company for the benefit of certain persons in the Powder Company employ?

Second. Was the action of the finance committee an acceptance, rejection, or retention of Coleman's offer?

Third. Was the action of the board of directors, in approving, ratifying, and confirming the action of the finance committee, an acceptance, rejection, or retention of Coleman's offer?

That there was no acceptance of the offer is conceded by every one. The matter then resolves itself into the further question: Was there a rejection by the Powder Company of the offer? For, if there was, then the foundation on which this bill rests disappears. Or, lastly, if there was neither rejection nor acceptance, but an attempted retention of Coleman's offer by the Powder Company, for the purpose of carrying out the specific purpose of resale to certain employés of the Powder Company, were the circumstances surrounding such retention such as to constitute Pierre Du Pont an agent of the company to negotiate further in regard to such offer. That, as we have said, there was an acceptance of Coleman's offer no one contends. Was there a rejection? The defendant says there was; the plaintiffs say not. What, then, is the proof in that regard? That there is a variance in the proofs in regard to this phase in the case is apparent, but that this means there is a willful misrepresentation on either side we do not believe, and our closer study of the proof, the situation and viewpoint of the

different participants, satisfies us that such differences as do exist are attributable to such different viewpoints, the relation they bore to the matter, and the natural tendency of us all to remember and emphasize, particularly in the after-light of later events, the things, words, or events which confirm our present views.

Starting with the meeting of the finance committee on December 23d, we have the acknowledged situation of an offer of Coleman made to the company and a meeting of the finance committee called at the request of Alfred Du Pont to consider that offer. We find nothing whatever in the testimony to warrant the belief that either Pierre, William, or Alfred Du Pont went to that meeting with any other purpose than considering the offer of Coleman. It was an offer that would naturally have both concerned all of them as large stockholders and interested them as officers of the company. The situation was a grave one. Coleman was the largest stockholder of the company, he was on the eve of a grave surgical operation, he had been approached to sell his stock, he feared some of the leading men of the company might be drawn away from it, and he was anxious to hold them. That Pierre was anxious to accept Coleman's offer then, that he voted against the resolution that was finally offered, that when he purchased Coleman's stock in February, 1915, he carried out, in substance, the plan which Coleman, in December, wanted carried out, namely, the acquisition of large portions of Coleman's stock by leading men in the company, shows conclusively that, tested by Pierre's motives, wishes, and subsequent acts, we are justified in finding that, when Pierre entered that conference, when he voted against Alfred's motion, and when he testified that he was in favor of the acceptance of Coleman's offer, such was the fact.

Such being the case, what motive would Pierre have for withholding from Alfred and William the full terms of Coleman's letter? The only pertinent fact alleged to have been withheld was Coleman's belief that the stock he offered at $160 he regarded as worth $180 or better. Pierre had every reason to tell his associates of this fact. He was urging the acceptance of Coleman's offer at $160. On the other hand, Alfred and William were contending $125, or at most $133, was its full value. Coleman's letter would, so far as Alfred and William had confidence in Coleman's judgment and the fairness of his offer as a benefit to the company, have strengthened Pierre's wish to accept the offer. What motive could Pierre have then had in suppressing Coleman's view? We can readily see how Coleman's view would, in point of fact, have no weight in deciding this matter, other than to show the utter hopelessness of Alfred and William bringing to the price of $125 or $133, the price they contended for stock, which Coleman was offering at $160, and which he regarded as worth $180, or even $200, and whose then belief subsequent events more than justified. Indeed, it is quite evident that this estimate of Coleman's was a mere surmise, and that the data on which he formed that surmise was equally open to Coleman, to Alfred, to William and to Pierre, as officers of the company, all conversant with its present and prospective work, with its book values and its contracts. The data from which Coleman judg-

ed was open to them all, and as officers and business men they formed their own estimates, Alfred and William at $125, Pierre at $160, and Coleman at a higher figure.

It requires no minute reading between the lines to see the fundamental difference between Alfred's and William's views, who based their value of the stock on dividends then being paid, while Coleman looked to the future possibilities of contracts and expansion, which was known to Alfred and William and did not affect their estimate of present values. It is therefore quite apparent to us that Pierre was anxious to see Coleman's offer accepted, that the formal recording of his vote favoring such acceptance, that the absence of any object he could have had in suppressing Coleman's prediction of higher value, of the fact both the Atlas and Hercules Companies accepted Coleman's offers for their employés, made to them in the same letter, and there is no proof that any suppression of Coleman's letters was made when Hercules and Atlas took action; all of these considerations lead us to the conclusion that we find no motive for Pierre's withholding the letter, and when we couple this with the fact that Alfred himself made the motion which recited that "Mr. P. S. Du Pont presented a letter from Mr. T. C. Du Pont, offering to sell 20,700 shares of common stock of this company at $160 per share," that he subsequently verified such minute by signing the same, and that the doings of the finance committee were reported to the directors in the statement that "an offer was received from Mr. T. C. Du Pont to sell 20,700 shares of the common stock of this company at $160 per share," we are justified in feeling no concealment of these letters was made by Pierre.

Moreover, we must not overlook the fact that the proofs show that Coleman's offer in his letter of December 7th was only for 20,000 shares of stock, and this the offer which Pierre told Alfred about, and about which Alfred wrote in his letter to Pierre of December 14th. But, as we have seen, Pierre testified that at Coleman's request he (Pierre) prepared a list which showed that 20,700 shares would have to be provided to carry out his plan, and that on December 14th he received the letter from Coleman, changing his offer to 20,700 and requesting an early answer be given to Mr. Dunham, his secretary—two elements that were not embodied in the letter of December 7th. There is no proof by Alfred that Pierre laid this second letter before the meeting of the finance committee on December 23d, and as the motion made by Alfred at that meeting recites that Coleman's offer was 20,700 shares, and instructs Pierre to give notice, not to Coleman, but to Dunham, it would seem that the statement in the minutes that a letter was presented probably records what happened.

Moreover, the minutes, and the absence from the minutes of any copy of the letter, and the testimony that Pierre informed his colleagues on the committee of the fact of the offer, but did not produce the letters themselves, suggests that, if such was the course of the procedure, it points toward the conclusion that the action of the committee was intended to be a declination of the offer. For let us suppose these three experienced business men had before them an offer for $3,200,000 of stock made by a sick man, and which they wished to retain and re-

port to their board; would they not naturally have placed that offer on their minutes? On the other hand, if they felt the offer was so far beyond the value of the stock as they testified they then thought, and if they were ready to decide on that price and decline Coleman's price of $160, it was quite natural for them to omit calling for the letter and placing it on the minutes. That no one called for the letter, that no one suggested putting it on the minutes, is in line with the contention that the purpose the committee had in view, and what Alfred's motion had in view, was a then declination of Coleman's offer. All the circumstances called for prompt action. In his offer of December 14th Coleman said:

"I am willing to sell for the purpose 20,000 shares at $160 per share ex dividend, payable in say 30 or 60 days."

Having named no time for acceptance, Coleman's offer was liable to withdrawal at any time. He requested a speedy action, saying he had other offers, and that—

"Inasmuch as important men associated with us have asked me to sell them some stock, I should like to have a prompt answer from the finance committee to enable me to reply."

The letter of Alfred to Pierre on December 14th, "I would suggest that no decision as to the actual price be given to the present owners until the finance committee has had ample time to think the matter over and discuss it together," and in his second letter of the same date, "I presume that this matter will be discussed at our next finance meeting on December 30th," indicate that he recognized the propriety of some answer being given, and that a decision should be made at the next meeting of the finance committee. And the fact that action was taken up at a meeting a week earlier than the expected meeting of December 30th, and that whatever action was then taken was on the motion of Alfred, tends to show that the decision which in his letter of December 14th he suggested should be postponed to await the discussion of price, which he suggested should be done by the finance committee, and such price discussion having taken place with no change of view on his part, it would seem reasonable that, when he offered the resolution as recorded in the minutes, or that resolution with the words "now" or "at the present time" added, he offered that with a view to reaching a decision. If the company wished to consider the offer of Coleman further, it was sufficient to take no action. If they wished to make a counter offer to Coleman, it was open to embody such counter offer in a motion. If they were not prepared to reach a decision on Coleman's offer, and wished to report the matter to the board and get their view, it was open to them to so move and act. But the finance committee neither took action by motion in a counter offer to Coleman, nor a reference to the board of directors, but the motion by express reference did direct a communication with Dunham. Why communicate with Dunham? Why did Alfred select Dunham as the person to be notified? There is no proof that he had power to continue Coleman's offer; there is no proof of authority in him to consider a counter offer.

·Why, then, did Alfred's motion select and draw Dunham into the matter? The fact that he was thus selected by Alfred is evidenced by the motion, and we can understand and carry out the intention of the Powder Company, then evidenced by the acts of its own officers and embodied in its own minutes, on no other rational theory but that the finance committee by that motion intended to decide on Coleman's pending offer and communicate that decision to Dunham. That they actually intended to do something, that they meant that what they did do should be notified to Dunham, and that what they did was of such moment that Pierre Du Pont had his vote recorded against the action of the committee, and all facts tending to deepen the conviction that the recorded action of the Powder Company taken by its finance committee acting through a majority of its members evidenced a decision of the Powder Company not to then accept Coleman's offer. And the fact that they directed information of its action in reporting their action to Dunham and in their report to the board of directors "the committee expressed the feeling that we are not justified in paying more than $125 per share for this stock, and asked Mr. P. S. Du Pont to take the matter up with Mr. T. C. Du Pont further," and their making no allusion to Dunham, deepen the belief that the finance committee, the board, and therefore the company, regarded Coleman's offer at $160 of 20,700 shares of the common stock of the company for distribution among certain of its officers as declined when Dunham was notified, and that, if anything further was to be done, it was by negotiations direct with Coleman. Indeed the suggestion in the report of its action to the board, "that it had asked Mr. P. S. Du Pont to take the matter up with Mr. T. C. Du Pont further," read in connection with the report that "the committee expressed the feeling that we are not justified in paying more than $125 per share for this stock," can only be explained on the theory that when he notified Dunham, he did all the finance committee wished him to do.

Moreover, that a decision that the company could not accept Coleman's offer was a reasonable one, and one to which a majority of the finance committee might fairly come, and which they were then prepared to decide, is quite apparent from the proofs. The finance committee was not considering a purchase of this stock for the Powder Company; it was to go to certain officers of the company as an attractive investment, which they were obtaining at an attractive price. It was the viewpoint of the officers who were to get this stock that had to be considered. The company could not gain by the transaction, but it might lose or tie up a lot of its funds if the officers would not invest in the stock after the company took it. William Du Pont says he agreed with Alfred's view, and there was no doubt as to Alfred's unvarying position all through, that this purchase was for the benefit of the officers and the price would not attract them. As we have seen, Coleman's offer was made in a letter to Pierre dated December 7th. Evidently the price had been discussed between Alfred and Pierre, and the matter had been further considered by the former, and on December 14th he wrote Pierre:

"After giving the question of purchasing a certain large block of Du Pont common further consideration, I believe that 160, the price you talked of, is too high. 150 would be purchasing it on a 6 per cent. basis, and 160 a 5 per cent. This is too low a rate for the company to invest its spare funds, and furthermore, if it were offered to any of our employés, it would not be sufficiently attractive at that price. I see no objection to the company's purchasing this stock, but the question of price is one of grave importance, owing to the large investment."

A week later, in writing under date of December 21st, to correct the price of 150 and reduce it to 133, to put that price at 6 per cent., Alfred adds, in his letter already quoted, to his former position that the officers might not take the stock, and that the stockholders of the company might object to the acquisition of the stock at 133 saying:

"I doubt whether the investment of the company's surplus earnings by the finance committee on a basis even as high as 6 per cent. could be justified. In other words, if the company is unable to invest its surplus earnings at a rate better than the stockholders might themselves, they might contend that these earnings should be distributed in the form of a dividend. I presume that this matter will be discussed at our next finance meeting, on December 30th."

The views stated above Alfred still held and then expressed when the finance committee meeting was held. The proof in that regard is:

"A. I stated that the purchase of the stock for distribution among employés was in principle good, but the investment was so large that the finance committee, in my opinion, could not justify the investment of so large a sum unless on a 6 or 6½ per cent. basis, and inasmuch as the Du Pont common stock had been paying for some time but 8 per cent., and that at that particular time there was no immediate prospect of its being increased, that I suggested that the price was too high, $160 a share, and suggested the price of $125 a share as being more in conservation with the company's interests.

"Q. What did Mr. William Du Pont say about the advisability of the purchase? A. He agreed with me in that thought.

"Q. What did Mr. P. S. Du Pont say as to the advisability of making the purchase? A. He expressed a belief or opinion that the price of $160 a share was a proper price for the company to pay."

It will thus be seen that when the meeting came off all three men still had their unchanged views. Pierre favored acceptance at $160; Alfred and William stood on $125, asserting their belief the dividends of 8 per cent. then paid by the company would not be increased. With these decided views held by experienced business men, all of whom were its leading executive officers and conversant with its affairs, it is quite evident that they were all in a position to answer Coleman's request that his offer at $160 be promptly disposed of, and that the wide divergence of estimate of value between Alfred's and William's estimate of $125, which Coleman as well as Pierre regarded as worth $160, made such a wide split as showed all the parties that the nonacceptance of Coleman's offer was a foregone conclusion, since Alfred and William were in a majority on the finance committee. When, therefore, the committee reported its action to the board, its suggestion that it had "asked Mr. P. S. Du Pont to take the matter up with Mr. T. C. Du Pont further" was rather a courteous way of declining what Coleman regarded as a generous offer, tending to deepen the interest of its officers in the company; and, indeed, that no trust or

agency was then conferred on Pierre by the finance committee to nego-
tiate further with Coleman in reference to his offer of 20,700 shares of
common stock at $160 is indicated, not only by a lack of corporate action
at that time expressed in what was recorded, but assuming, for present
purposes, that to it are added the words which Alfred says were
omitted "at this time," or "at the present time," their addition does not
lessen the general effect of the resolution. This resolution, reduced to
writing, evidenced the action of the Powder Company by its executive
committee, and it further embodied the instructions which Pierre Du
Pont was to convey to Dunham, the attorney of Coleman.

There can be no question but that if, in pursuance of the instructions
contained in that resolution, Pierre Du Pont or any other officer of the
company had sent a copy of this resolution to Dunham, that such reso-
lution would, in law and fact, have constituted a decision of the Powder
Company declining Coleman's offer, and that the company could not,
therefore, maintain any action based on the theory that, in law or
equity the company itself, or the officers of the company for whom
it was intended, had any claim or right to those 20,700 shares of
Coleman's stock. Indeed, we do not understand that it is now contend-
ed that this resolution, standing alone, evidenced a retention of Cole-
man's offer for further consideration; but it is alleged that what was
talked of at the meeting, and what was then said by Alfred Du Pont
to Pierre, made the latter an agent of the company to continue negotia-
tions for this stock with Coleman.

Turning to the proofs for the evidence of such agency, we find a
sharp conflict of proof. On the one hand, Pierre as will appear from
his testimony quoted at length above, says he had no such agency. In
that respect he was asked:

"Q. Mr. Alfred I. Du Pont says that at that meeting, after the adoption of
this resolution, he said to you, 'In reporting this, try and have T. C. Du Pont
keep it open for a month or two.' Was anything of that kind said to you at
that meeting? A. I have no such recollection. I am sure I had no such in-
structions."

Here, then, we are face to face with the crux of this part of the case.
The finance committee had taken action on Coleman's offer. That
action was embodied in its resolution; its action was to be communi-
cated to Coleman's agent, Dunham, either as it was recorded, or in the
wording contended for by the plaintiffs with "at this time," or "at
the present time," added. If such resolution was modified or affected
by any further or other action of the company, if any agency on behalf
of the company was created, how was such agency created, how was it
evidenced, and what were its terms? We say this question of Pierre's
agency is basic, for it is manifest that, if he was not then constituted
the agent of the company for some specified purpose in the premises,
this case has no foundation in fact.

We turn, then, to the question: Was Pierre then made the agent
of the company for further work, and, if so, what are the terms of the
agency, and what were the duties imposed by the Powder Company?
We begin this inquiry by noting that the subject-matter before this
committee was one of large moment; it involved in money over

$3,000,000; it concerned the policy of the company in deepening the interest of important officers of the organization. The meeting was convened for the purpose of reaching some conclusion, and it actually did reach some conclusion, which is evidenced by its written resolution. Such being the case, we are justified in expecting that, if the three officers then present thought anything further should be done by the company in regard to Coleman's offer, and that this company should have an agent to carry out such purpose, both the fact of the agency and the work intrusted to the agent would, in a matter of such moment, be evidenced by minute or resolution.

Turning to the minutes of the finance committee, we find, as we have seen, a total, and therefore a suggestive, silence on the subject of agency. These minutes have been subjected to the criticism incident to their importance as the storm center around which controversy lies. It has been urged that the words "at this time," or "at the present time," be added; but even so the significant fact remains that in all these criticisms there is no suggestion that the minutes fail to record any action of the meeting that was taken on the subject of agency. And in that connection it will be noted that in all of the subsequent meetings, conversations, and contentions which took place in the two months following, and indeed until this bill was filed, there was no assertion on the part of any one that the Powder Company had created Pierre its agent at this meeting. That suggestion first appeared after the bill was filed. Let us turn, then, to the sequence of events, and from them ascertain whether the fact of such agency was then evidenced by the acts or declarations of any of the three members of the finance committee who alone knew of such agency, if it was then created. But, before taking up such examination, let us first see what Philip F. Du Pont, when he filed the bill, and what Alfred Du Pont and William Du Pont said on the subject of agency, when they gave their testimony.

An examination of the bill shows no assertion that the Powder Company constituted Pierre Du Pont its agent at this meeting of its finance committee to negotiate for this 20,700 shares of stock, nor is recovery sought, as we understand it, on the ground of breach of such agency. As we understand the bill, recovery is sought on the broad ground that Pierre Du Pont by virtue of his relation as an officer of the company and his dominating influence in its affairs and his alleged misuse of such position and relation—not, be it observed, by breach of any agency created at this finance committee meeting—acquired Coleman's stock. Moreover, the bill seeks to charge Pierre Du Pont, not for the 20,700 shares of common stock, which were alone the subject of the finance committee's meeting, and which Coleman was offering for the benefit of certain specified employés, but for 13,899 shares of preferred and 63,214 shares of common stock, the absolute ownership of which the company is alleged to be entitled to exercise without liability to offer them to employés. Indeed, the averments of the bill, which we quote, do not base a right of recovery on Pierre Du Pont being constituted the agent of the Powder Company at the meeting of the finance committee, in reference to the 20,700 shares of common stock which

were to be sold to the company for its employés, but such alleged agency is urged simply as an element to affect and restrict the power of Pierre as an officer of the company generally and prevent him from buying any stock of Coleman's whatever, preferred or common. Turning to the bill, we find the sole statement in reference to the meeting of the finance committee of December 23d:

> That "it was thought that the price, to wit, $160 per share, was too high, and the hope was felt by the members of the finance committee that the said Pierre Du Pont might secure a better proposition for the purchase of the stock from T. Coleman Du Pont."

It will thus be seen that the bill did not allege the Powder Company had constituted Pierre Du Pont its agent, at the meeting of the finance committee, but that the extent of its alleged action was a hope by the members of the committee that Pierre might secure a better proposition than the one the committee had formally acted upon by resolution. And it would seem that this is as far as the testimony of Alfred goes. In that regard he says:

> "Q. Did you have any conversation with Mr. P. S. Du Pont relative to the question of what he should say to Mr. Dunham when he reported the action of the finance committee? A. At that meeting?
> "Q. There or thereafter. A. I suggested, after the resolution had been passed, that in conveying this information to Mr. Dunham that he tell Mr. Dunham to suggest to Mr. T. C. Du Pont that, if he could keep the offer open a month or two longer, we might be able to increase the price offered for the stock."

From the above it will be seen that no committee action was taken as to further negotiation, and that what was said by Alfred was a mere suggestion made by Alfred to Pierre that he (Pierre) tell Dunham to suggest to Coleman that, if he could keep the offer open for a month or two, the Powder Company might be able to increase the $125, it impliedly offered for the stock by Alfred's resolution. Whatever was said by Alfred is testified by him alone; Pierre testified he had no such instruction, and in William's account of the meeting he makes no allusion to having heard the suggestion Alfred made. Now, in view of the vague, indefinite, and conditional request testified to by Alfred alone, to the fact that William, the second member of the committee, does not mention any such suggestion in his testimony, and Pierre denies it, we are clear that any talk then had was not of a character that made Pierre the agent of the Powder Company, or William to regard it as such; and that no agency was then created by the company is apparent, as we shall see when shortly thereafter a situation arose when, if any agency had existed, Alfred would have called attention to the fact of such agency, but did not in fact do so.

As we have seen from his testimony, Alfred regarded the resolution as a counter offer of the Powder Company to Coleman of $125 per share for his stock, when he said, "if he could keep the offer open a month or two longer, *we might be able to increase the price offered for the stock.*" And William Du Pont testified that, when Alfred and Pierre were at a later day discussing the previous action of the finance

committee, Alfred said the resolution had been a counter offer. The testimony of William in that regard is:

"Q. After that meeting of the finance committee, when was the first time that you heard any discussion or talk about the proposition of Mr. T. Coleman Du Pont? A. In February, the meeting held in February.

"Q. About what time in February, can you tell us? A. I should think it was the second Wednesday in February.

"Q. That would be about the 10th? A. I suppose so. Meetings of the finance committee were held on the second Wednesday of each month.

"Q. Who were present at that meeting of the finance committee in February that you speak of? A. Mr. P. S. Du Pont, Mr. Alfred I. Du Pont, and myself.

"Q. What reference was made to the offer of Mr. T. Coleman Du Pont at that time? A. Mr. Alfred I. Du Pont asked how the negotiations were coming on.

"Q. Whom did he ask? A. Mr. Pierre S. Du Pont.

"Q. What did he reply? A. As near as I recall, he replied that they were off.

"Q. Did Mr. Alfred I. Du Pont say anything to him about it further? A. He asked why they were off, and Mr. P. S. Du Pont replied, I think, through the action of the finance committee. I am not quite clear about what the words used were.

"Q. Was that the substance of it? A. That was the substance of it; yes.

"Q. Then what did Mr. Alfred Du Pont say, if anything? A. He said that was not his recollection. He asked me if it was my recollection. I said, 'No, it was not supposed to have been final.'

"Q. Did Mr. Alfred Du Pont tell him what he thought the finance committee's action was? A. Yes.

"Q. What did he tell him, if you recall, either in substance or words? A. I could not recall the words. He told him that the offer made before had not been a declination in any sense; simply *it had been a counter offer.*"

It will thus be seen that Alfred regarded the resolution as constituting a counter offer to Coleman, and that such offer kept Coleman's offer open and undisposed of. On the other hand, Pierre thought Coleman's offer had been rejected by the passage of Alfred's resolution by the finance committee on December 23d. These opposite positions of the two men, Alfred and Pierre, are very important, and the date, February 10th, is of even greater significance. Therefore, at the meeting of the finance committee on February 10th, William and Alfred, as officers of the company, were brought face to face with the fact that Pierre, whether rightly or wrongly, had construed the resolution as a refusal of Coleman's offer, and had, in pursuance thereof, called the matter off. Touching this point, Alfred Du Pont's testimony is:

"Q. On February 10th where and at what time did you have a conversation with Mr. P. S. Du Pont on the subject of this Coleman Du Pont stock? A. About 3 o'clock in the afternoon of February 10th, in the room where the finance committee was accustomed to meet.

"Q. That was in the Du Pont Building? A. Yes, sir.

"Q. Had there been a meeting of the finance committee? A. There had been a meeting of the finance committee, as I remember.

"Q. Who were present? A. Mr. P. S. Du Pont, Mr. William Du Pont, and myself.

"Q. This conversation was about 3 o'clock? A. About 3 o'clock; yes.

"Q. Was it after the meeting of the finance committee, or before? A. After the regular business had been discussed.

"Q. What took place as to what Mr. P. S. Du Pont said and what you said? A. As I was about to leave the room, I remarked to Mr. P. S. Du Pont, 'How

are the negotiations for the Coleman Du Pont stock progressing?' He remarked to me, 'Why, they are all off.' I said, 'Since when?' I had not been informed that they had been called off. He said, 'They were called off shortly after you and Mr. William Du Pont turned down his offer in December.' I said, 'But the offer was not turned down.' I said, 'There was merely a difference of opinion as to price, and it was my understanding that you were to convey to T. C. Du Pont, through Mr. Dunham, the information of the fact that we believe the price that he demanded for the stock, of $160 a share, to be excessive, and *we suggested $125 a share as a proper price for the stock* at that time.' Mr. P. S. Du Pont said, 'That was *not my understanding. My understanding was that you turned down Mr. T. C. Du Pont's offer definitely.*' I appealed to Mr. William Du Pont, who was seated across the table, within a few feet of me, and I asked him whether his understanding was consistent with my own. He said it was. I then said to Mr. P. S. Du Pont, 'There seems to have been some misunderstanding as to the position taken by Mr. William Du Pont and myself as to the meeting in December, and I desire to have this matter cleared up.' I said, 'You have unintentionally misinformed Mr. T. C. Du Pont, and I suggest that Mr. William Du Pont and I write to Mr. T. C. Du Pont, setting forth our views.' Mr. P. S. Du Pont agreed that that would be an excellent course to pursue. Thereupon I asked Mr. P. S. Du Pont if he would kindly send me such correspondence as had passed between himself and Mr. Dunham or Mr. T. C. Du Pont in reference to the action of the finance committee on the date of December 23, 1914, so that I might be fully informed as to precisely what he said and before I, in turn, placed my view before Mr. T. C. Du Pont. He kindly said that he would do so. I also asked him if he would please send copies to Mr. William Du Pont, so that, in the event of his desiring to write to Mr. T. C. Du Pont, he would be fully informed and could do so. That was all that took place, as I remember, at that meeting.

"Q. On the 10th of February, 1915? A. 1915." ·

The testimony of William was that, when Alfred asked Pierre how the negotiations were coming on, the latter replied they were off "through the action of the finance committee," and that Alfred said in reply "that the offer made before had not been a declination in any sense, simply it had been a counter offer."

It will thus appear that at this meeting of the finance committee on February 10th the Powder Company was brought face to face with the information that the offer of Coleman had been called off, and that Pierre had called it off because of the resolution. Neither Alfred nor William then took the position that Pierre had been constituted an agent to continue the negotiations, but that the resolution was a counter offer, for if such agency had been created, and Pierre had failed to execute it, that meeting of the executive committee was the time to have the agency reasserted, or such agency assumed by some other member of the committee. But instead of treating the matter as one of agency growing out of Alfred's suggestion, all three men stood on the effect of Alfred's resolution; Pierre saying it was a declination, and Alfred and William that it was a counter offer.

But what followed is of even more significance. We have seen that neither William nor Alfred took the position that the latter's suggestion had created an agency. But the matter did not end there. As testified to by Alfred Du Pont, he then said to Pierre Du Pont:

"There seems to have been some misunderstanding as to the position taken by Mr. William Du Pont and myself as to the meeting in December, and I desire to have this matter cleared up. You have unintentionally misinformed

Mr. T. C. Du Pont, and I suggest that Mr. William Du Pont and I write to Mr. T. C. Du Pont, setting forth our views."

From this it will be quite evident that, if William or Alfred subsequently wrote such letters, we have a contemporaneous written record of what position the company then took acting through its officers. And this action becomes all the more important, because there is no evidence whatever that at that date Pierre, as we shall see by the correspondence between Coleman and Pierre—that neither of them had at that time, February 10th, any other thought or purpose in view than of Coleman selling the 20,700 shares of stock, and the company buying it for distribution among its officers. If, therefore, William or Alfred wanted to continue negotiations open with Coleman, the opportunity was open to them to do what they now knew Pierre had not done. In point of fact, William, who left Wilmington shortly after the meeting, did not write and did nothing; but Alfred did write Coleman, but his letter, dated February 16th, discloses three things:

First. His letter makes no mention or assertion of the Powder Company's having made Pierre its agent to continue negotiations at the finance committee meeting on December 23d.

Second. With information before him that Pierre had declined Coleman's offer, no suggestion is made that he had no authority to do so.

Third. The letter assumes a decision had been made at the meeting in reference to the offer, and that the purpose of the writer was to explain to Coleman why he had advocated "the finance committee's decision in the matter." The letter is as follows:

"Dear Sir: At a meeting of the finance committee, held some time in December, Mr. P. S. Du Pont brought to the attention of the committee your wish to dispose of 20,000 shares of common stock of the Powder Company at $160 per share, with the suggestion that same be redistributed upon some liberal basis among the more important of the company's employés. The committee were in accord with your general idea, viz. the purchase from you of 20,000 shares of stock, and I believe were also a unit on the point of a redistribution of at least a portion of this stock to the company's employés, upon some plan to be subsequently defined. The one point, on which there seemed to be a difference of opinion, was the question of price. The position which I took on this point, and which I believe was similar to the one maintained by Mr. William Du Pont, was that in purchasing this stock at the price suggested by you, which would involve the expenditure of $3,200,000 of the stockholders' funds, an investment of this size by the finance committee could not be defended on a return of less than approximately $6\frac{1}{2}$ per cent., or at least better than 6 per cent., and for this reason the price of $125, or an investment on a basis of, roughly, $6\frac{1}{2}$ per cent., was suggested. It is my opinion that this principle should be the guiding one in any investment of the company's surplus funds, in lieu of a distribution of same.

"Again, in offering this stock for subscription to our employés, it should be made on an attractive basis, which, in my opinion, should not be less than $6\frac{1}{2}$ per cent., and, as the company cannot afford to lose on a transaction of this kind, it was manifestly impossible for it to purchase stock at one figure and offer it to its employés at a lower one.

"I believe it is an excellent time to make an offer of this character to the employés at as low a figure as is consistent with the company's interests, in order that the employés may benefit by any increment in value, which the present conditions would seem to indicate as quite probable, and I furthermore believe that, if the company can purchase this stock from any outside

source, it would be better to acquire it in this manner, rather than issue its treasury stock for the above-mentioned purpose.

"I am setting my position before you clearly, for the reason that I have lately ascertained from Mr. P. S. Du Pont that he did not understand my position as I had intended to present it, and for this reason I feared that he had unintentionally conveyed to you a wrong impression as to my reasons for advocating the finance committee's decision in the matter."

From the letter, and the testimony of the parties as to what took place at the meeting of February 10th, we are justified in concluding that at that time Pierre insisted the matter was closed by the resolution, and Alfred in his letter assumed a decision had been made at the meeting of December 10th, and his only concern was that his position and reasons "for advocating the finance committee's decision in the matter" should be understood by Coleman. When we consider that this letter was written by one member of the finance committee to another, that there was no reason why, if Alfred felt Coleman's offer had not been decided upon, he should not have said the company would take it up or wished to consider it further, or if Pierre had been made an agent to negotiate further why Alfred should not have so told Coleman. The opportunity and indeed the duty of Alfred as an officer of the company to then and there state and urge his company's rights, if he then considered it had any such rights, was imperative; and the fact that Alfred did not on February 10th, when the occasion challenged such action, assert the agency of Pierre, and if the latter denied it, or declined to act as such, himself, as an officer of the company and a member of the executive committee, call the same to the attention of Coleman, when, as vice president, he wrote him on February 16th, are all facts and circumstances which strongly indicate that on February 10, 1915, all three members of the finance committee, for different reasons and from different views, all acted on the status that the offer of Coleman of the 20,700 shares was declined.

Such being the status of the Powder Company and Coleman in relation to such offer, as evidenced by the several acts or omissions of the three members of the finance committee on February 10th, let us inquire what was the status of the stock between Pierre and Coleman.

Taking up the testimony from that angle, let us view the situation from Pierre's and Coleman's standpoint. As we have said, in the fall of 1914 Coleman Du Pont was the largest stockholder of the Powder Company and had been and was its head. He was confronted by a serious personal situation, which might end his life in the operation in the hospital to which he was going. He had been solicited to sell his stock, by men prominent in the company. It has been the policy of the company for many years to purchase its own stock in order to enable its employés to become owners of such stock, and it is quite plain to read between the lines and see that Coleman, in addition to following out this policy of the company, felt that the placing of this large block of his stock in the hands of the administrative officers of the company would counteract the offers he foresaw would, in the great activities of the war, be made to them, not only to leave the company, but possibly to embark in the powder business themselves. It is quite evident from

256 F.—11

the correspondence, also, that Coleman was deeply interested in his plan of stock distribution to the employés. Indeed, in the nature of things the stability and value of Coleman's remaining stock would be increased for his estate if his operation terminated fatally. From Pierre's standpoint and the proofs, it is equally clear that he, too, was anxious about the status of Coleman's stock, but for a totally different reason. His attention had been sharply challenged by the report—the proof as to which we quote later—that anti-Ally interests might buy from a stockholder said to be in financial difficulties large blocks of the stock. If the stock was bought by these anti-Ally interests, future contracts could not be gotten from the Allies. Pierre looked, therefore, with great favor on Coleman's wish to dispose of this large holding for distribution among the leading members of the company. It requires no reading between the lines to see that, whether justly or not, the fact was that Coleman felt that for some reason Alfred Du Pont had thwarted his plans and might thwart this one. And it is equally clear that a warm intimacy existed between Coleman and Pierre, that he confided his plan to Pierre, and before he made any offer to the Powder Company, Pierre, doubtless at Coleman's suggestion, had ascertained in advance of Coleman's offer that Alfred favored it. That Coleman felt, as noted, Alfred's opposition, he frankly states in a letter to Pierre of January 6, 1915:

"I am sorry that Alfred has taken the position you indicate. * * * I, of course, know Alfred had some ulterior motive in mind, as he has tried to do what he could against me at every opportunity; but this we both know and always take it into consideration."

And that Pierre had taken the precaution to ascertain Alfred's attitude toward the offer in advance is shown by Pierre's letter to Coleman of January 4, 1915:

"I have been intending to write you about the reception of your proposition by the finance committee. Unfortunately, Alfred, who had approved the plan before you went away, got somewhat crosswise in the meeting, and I think it wise to let the matter rest for the moment; preferably until I can see you, before taking any other step."

Assuming, however, that the wish expressed by Alfred at the finance committee meeting of December 23d, to wit, "I suggested, after the resolution had been passed, in conveying this information to suggest to Mr. T. C. Du Pont, that if he should keep the offer open a month or so longer, we might be able to increase the price for the stock," made Pierre an agent to get an extension of Coleman's offer, let us turn to the proofs and see whether Pierre made such effort.

Following the meeting of the finance committee, Pierre wrote Coleman on January 4, 1915, informing him of the outcome of his offer:

"Dear Coleman: I have been intending to write you about the reception of your proposition by the finance committee. Unfortunately, Alfred, who had approved the plan before you went away, got somewhat crosswise in the meeting, and I think it wise to let the matter rest for the moment, preferably until I can see you, before taking any other step. I am sorry and provoked that the proposition did not go through, for I feel that your offer was a generous one, and should have had more considerate treatment; but, like many other things, the final result cannot be obtained quickly. The Hercules plan was accepted in very good spirit. It is held up temporarily, because their attor-

neys have told them their company cannot loan the money to the directors. Technically, this may be correct; but I do not think they should hesitate to put the thing through, nor do I think they will. The Atlas people, acting under the same laws (of Delaware), have accepted the proposition and I understand from Lou Dunham today have taken over the stock. Undoubtedly the Hercules will come to the same conclusion."

We here note that this was the letter which Pierre did not turn over to Alfred in compliance with his request on February 10th, and which Pierre says he did not then give him, because he regarded it as a personal one. It is quite evident the letter, while it did report the reception of Coleman's offer and to that extent was a business letter, was one which Pierre rightly termed personal, and one which he naturally would not care to hand over to Alfred on account of the terms he used in reporting that Alfred had changed his attitude toward the offer. We are referred to nothing in the letter which would have in any way affected anything which Alfred wrote Coleman in his letter of February 16th quoted above, and a reading of this personal letter would certainly not have been conducive to the spirit of good will which the welfare of the company demanded should exist between its officials. The letter contains nothing pertinent to the case which in any aspect Pierre had any interest in concealing, and it is quite evident that in any aspect the withholding of it from Alfred was a matter of judgment, and not of violation of duty. On the other hand, and as evidencing the then state of mind of Pierre toward Coleman's offer, it is significant that, although Pierre regarded the offer as not accepted, it is quite evident that his effort was to keep Coleman from being rebuffed, and induce Coleman to carry the offer along. He tells him his Hercules plan was accepted in good spirit, that he thinks it will go through, and that his Atlas plan was accepted. And his suggestion "I think it wise to let the matter rest for the moment, preferably until I can see you, before taking any other step," was certainly along the line of encouraging Coleman to go ahead with this plan.

On receipt of Pierre's letter, Coleman did not withdraw his offer, but left it still open, writing Pierre on January 6, 1915:

"Perhaps it would be well for me to withdraw the proposition; if you think so, do it."

If Pierre had any ulterior purpose, here was his opportunity to withdraw the offer, for Coleman authorized him to do so. But the letter of Pierre to Coleman in reply, January 9, 1915, shows Pierre urging Coleman to follow up his offer. We quote what Pierre wrote:

"I feel you must be much disappointed in the question of the stock subscription. I used my best judgment in not trying to force the situation. Possibly I could have put it through by insisting, but at great risk of having the other side pitted against me; that might have complicated the whole plan for good and all. As it remains now, I feel that the proposition *is open for reconsideration at your option*, of course. Willie is away at present, but will be back in a couple of weeks, *at which time I will take up the work again*, unless I have word from you to the contrary. My judgment is that *the deal will go through this time*."

That Pierre's letter had the effect of encouraging Coleman to allow his offer to stand is shown by Coleman's reply, January 11th:

"As to stock subscription, I believed it was a good thing for the company when I made the offer and made a price that I thought low; but I concede that I have always placed a higher value on the stock than others. I did it for the good of the new committee, but am not anxious from a selfish stand-point to carry it out, except for the good of the company, and that is more important than personal reasons. If you feel it a good thing for the company, talk to Willie and do it; if not, don't. It may make some diff. in my Equitable finances, but I think not; that is, I think I can make some arrangement when I get back that I canceled before leaving, so use your own judgment."

From the above it is evident, first that Coleman, by his designation of William Du Pont as the one for Pierre to talk to, still felt Alfred would oppose his plan; second, that Coleman felt his plan was an unselfish one, and his offer below the real value of the stock; and lastly, that he had some financial calls on him which he had evidently expected to meet, from the company's acceptance of his offer. Indeed, that Coleman had counted on his offer being accepted by the company, and that he had made some changes in his financial arrangements which the non-acceptance of his offer by the Powder Company led him to change, is indicated in his letter to Pierre of January 6th, when he says:

"After talking to you, I told some New York bankers that I would not need the money that I had arranged to get from them, as I had made a more permanent arrangement, but can, I feel sure, fix this when I get back. Perhaps it would be well for me to withdraw the proposition; if you think so, do it."

The suggestion of Coleman, that his offer be taken up by Pierre, Pierre promised to carry out, and he also suggested to Coleman that if the effort to get William's consent failed, and consequently the company would not take the stock for the men, that an offer be made direct to the men. Of the effort to be made with William and the offer direct to the men, Pierre on January 14th wrote Coleman as follows:

"As to the stock offer: In Willie's absence I shall do nothing. He will be here in a week, and I will try to get some action. If this is not possible, it will mean that the question of value of the stock was not uppermost in their minds. If not *finally accepted*, would you approve making an offer direct to the men? I should think that a financing suitable to you might be arranged. I am quite sure that they would like to take the stock, but do not feel in position to say anything while you are negotiating with the company. No one but the executive committee and directors know of the offer as far as I know. The board, of course, knew it through the minutes of the finance committee."

From the above it will be seen that on January 15th Pierre regarded Coleman as being willing that negotiations go on, that William was away, that Pierre would take it up on his return, and that Pierre was not only anxious to have Coleman's plan carried out of selling the stock to the men through the agency of the Powder Company, but that he then suggested to Coleman that, if the company did not accept his offer, Coleman's plan might still be affected by dealing direct with the men. From this correspondence and from the testimony, we are of opinion that up to January 15, 1915, when this letter was written, Pierre Du Pont was most earnest in his efforts and sincere in his purpose to carry out Coleman's plan and have the Powder Company purchase Coleman's offered stock for distribution among the men; that in that regard he

had done his whole duty as an officer of the company, if any agency and duty to continue negotiations with Coleman were placed upon him at the finance committee meeting of December 23d.

But on the day previous, January 14, 1915, Coleman, of his motion, in his letter of that date, had taken matters in his own hands and withdrawn his offer. In doing so he recognized that Pierre might have carried out his suggestion of talking to William Du Pont and committed him (Coleman). He therefore announced himself ready to stand by what Pierre had done, but, subject to such commitment, Coleman withdrew his offer. His letter was:

"Dear Pierre: Thinking over the stock offer matter; I still think it an advantage to the company, but in view of Alfred's position I think it best to withdraw it, if the finance committee has not accepted my proposition. When I get home, we can talk it over, and, if best, I can renew it, but seems very unbusinesslike to leave it in its present condition. Of course, if you have talked to Willie, or are in any way committed, that settled it. I will carry out any statement you have made; on the other hand, if you have not made any, my judgment is to withdraw it. Again, if you have any good reason for not doing so, let me know your position."

Subsequent to writing this letter, Coleman received Pierre's letter of the 14th, which we have quoted above, and thereupon Coleman confirmed the withdrawal of his offer by a telegram of January 17th to Pierre:

"Letter of fourteen received if you are not committed withdraw my offer will write."

With this letter and telegram, it will thus be seen that on January 14, 1915, Coleman Du Pont, of his motion, withdrew his offer of 20,700 shares of common stock, and with such action on his part any and all foundation for any claim on the part of the Powder Company to an acquisition of this stock, and of course the obligation of every agent or officer of that company to take any steps looking toward the acquisition of said stock, ended. The facts now known and recited above make that very clear, and we have no doubt that, had the whole correspondence between Pierre and Coleman been made known by Pierre to William Du Pont and Alfred Du Pont when the finance committee met on February 10th, we venture the opinion that possibly the present controversy would not have arisen. We do not say there was any legal duty on Pierre Du Pont to state all these facts. We do not say that he violated any duty in not stating them, but we have no hesitation in saying that a spirit of entire frankness on all sides, and especially between Pierre and Alfred, might have saved a large part of these troubles.

Starting, then, with January 14, 1915, when Coleman withdrew his offer, and when no further duty in regard to Coleman's offer of December 7, 1914, rested on any member of the executive committee in regard to the 20,700 shares of Coleman's stock embraced in that offer, we note that, so far as the syndicate members are concerned, we have reached the conclusion that we find no responsibility on the part of Pierre Du Pont in connection with the offer by Coleman of 20,700 shares of stock for distribution among employés, which after the offer was withdrawn by Coleman incapacitated Pierre or the syndicate mem-

bers from thereafter dealing with Coleman for the purchase by themselves of any or all of his stock in the company, if in such subsequent transactions they did not misuse their positions as officers, or misuse the resources or rights of the company in making such subsequent dealings.

Turning, then, to the sequence of events following the withdrawal by Coleman on January 14th of his offer of 20,700 shares, it appears that some correspondence followed which is of no legal bearing on the case, but which shows that Pierre still had in mind the possibility or desirability of Coleman carrying out his original plan. Thus on January 18th Pierre wrote Coleman that he had not seen William Du Pont and had not committed Coleman in any way and expressed his disappointment. The letter reads:

"My dear Coleman: Yours of the 15th has just come to hand. I have not talked with Willie alone, as he has been absent a couple of weeks and will not return for another week. However, as he supported Alfred in the stock proposal, I feel that I have obtained his opinion; but I had hoped that they would both swing around at our next meeting. There is, of course, no commitment; but I think there will be some disappointment, as I believe that the members of the executive committee were anxious to take the stock. Of course, no others than the executive committee and the board know of the offer; but I am sure that all the men would like to make the subscription, if the offer was made to them. I will, of course, do nothing further until I am authorized by you."

Coleman's letter of January 19th to Pierre:

"Inasmuch as Christmas and January 1st are past, I don't think two or three more months will make any difference, and in my mind it would be such a good thing for the young men to have a stock interest that I am sure we can arrange for them to take it without it being purchased by the company, through one of the New York banks, probably the Bankers' Trust Company; but I believe, if this is left until I get home, we can work it out better."

This shows that Coleman also still hoped that some arrangement to sell the stock to the men should be made, and on January 20th he follows it up by writing Pierre:

"Yours 18th received this a. m., and I am sure we can work out some plan on my return that will accomplish what we want. I cannot understand why the other two should not have taken advantage of the offer and let the company help the men on whom the success must depend."

On January 25th Pierre writes Coleman of a plan Alfred had suggested, but urged Coleman to go on with his own plan also. In that regard Pierre writes:

"I am sure that some plan of advantage can be worked out when we next meet. A couple of days ago Alfred suggested to me that the finance committee take up the question of selling treasury stock to our important men. What would you think of such a plan? I do not know what he had in mind, but suppose something similar to your offer, excepting at a lower price. I do not think it need interfere with your arrangement, if you desire to put it through also."

In the meanwhile, the common stock which Coleman had offered at $160, as the proofs show, was on January 20th selling at $186, and on January 26th it had reached $190. This meant that Coleman's offer at

$160 was then over $600,000 under the market price. From that time no further correspondence was had in reference to carrying out Coleman's plan, which silence was doubtless due to the fact that no one would expect him to renew his offer to the company under such conditions.

But on February 17th Coleman, of his own initiative, took a radical step on a totally different line. Instead of buying to sell to the company for the benefit of its employés, Coleman determined to sell 40,000 shares of his common stock outright at $200 per share, and following this offered to sell his entire holdings. How and to whom Coleman announced his purpose is testified to by Pierre Du Pont as follows:

"Q. Afterward you and your associates purchased the entire holdings of T. Coleman Du Pont? A. Yes.

"Q. Tell the court how that came about, what the first thing was that called it to your attention, whom you saw, and what took place. A. My attention was called to the stock by Mr. L. L. Dunham, T. C. Du Pont's secretary.

"Q. His representative? A. Yes. He called on me on February 16th or 17th—I think the 17th—and stated to me that he had authority to sell 20,000 to 40,000 shares of T. C. Du Pont's stock; that Mr. T. C. Du Pont had determined to sell that stock, and that it would be sold. I asked him whether he had authority to sell the stock then and there. He said he had authority to sell up to 40,000 shares at $200 per share, but that he would not make a sale of such a large amount without conferring with Mr. T. C. Du Pont, although he did have the authority.

"Q. What else was said, if anything? A. I asked him whether, if T. C. Du Pont sold as much stock as that, he would be willing to pool the vote of the remaining stock that he had with those who had purchased the large part of it. He said he did not know, but that he would confer with Mr. T. C. Du Pont by telegram, which he did; at least, he so reported to me the following day.

"Q. He reported to you that he had received a telegram, or that he had reported to T. C. Du Pont by telegram? A. That he had received a reply.

"Q. What did Dunham say to you as a result of his communication with T. C. Du Pont? A. T. C. Du Pont said he would sell all of his holdings, but would not pool any part of them with those who purchased a part, unless he knew the conditions of the pooling agreement."

We have to break the regular sequence of events to note that this purpose of Coleman's to sell his entire holdings created a condition of grave concern to the Powder Company, as to what might be the result if Coleman's stock was bought by interests hostile to the Allies. So vital was this stockholding to the Allies that the mere rumor of its possibility had led the Allies to send a messenger from Europe to ascertain its truth. These facts were known both to Coleman and Pierre but Pierre was satisfied on January 25, 1915, no such danger existed, and so wrote Coleman of the rumor, the coming of the representative of the Allies from Europe, and his own belief that no such danger existed, as follows:

"My New York visit was to meet Mr. Kraftmeier, who, with his wife and daughter, arrived on the Lusitania Saturday. He had cabled he wished to meet Irénée and me immediately on his arrival. I supposed that his mission was to place additional orders, so we took Col. Buckner along, and were much surprised to find that Mr. Kraftmeier made no mention of orders. Finally, after he succeeded in drawing me aside, he told me that they had had a report that Kuhn, Loeb & Co., of New York (who are a pro-German firm), had gained control of our company through the embarrassment of one of our large

stockholders, and that they on that account had fears concerning the orders placed with us. I, of course, assured him that nothing of the kind had happened, or would happen; that all orders would be filled according to contract, without any shadow of a doubt. He seemed somewhat relieved to hear this, and said this was one of the important things that brought him over. From his conversation I judge that it was *the* important thing, for no other part of our discussion seemed to be of moment. I imagine that the orders placed with our company are of serious concern to the Allies, and a rumor such as Kraftmeier outlined might well be worth a visit of investigation to the United States."

When then, on February 16th, 17th, Coleman took the new step of selling 40,000 shares outright, and followed that by a willingness to sell his entire holdings, we can see that a grave situation confronted Pierre Du Pont and one that called for prompt action. William was in the South, and he and Alfred had both expressed themselves as opposed to the price of $160, and would therefore be expected to oppose the acquisition by the company at $200 of 63,000 shares of common, when they had opposed the acquisition of 20,700 shares at $160. Indeed, as we shall hereafter see, the purchase of this stock by the company was one which experienced men testified would have weakened the company. And yet, unless the company or those in accord with its policy bought it, it might fall into hostile hands. In addition to this, as we shall hereafter see, there were at the time such grave problems of manufacturing capacity, extension, embargo, and other questions of product legislation confronting the company as made the purchase of this stock one of such large risk as might well deter men making the purchase. Moreover, it requires no reading between the lines to draw the conclusion that Coleman, who had been disappointed in his generous stock distribution plan at the price of $160, felt some satisfaction in forcing the company, or those connected with its management, to take at $200, either for themselves, for the company, or for its employés, stock which they had refused to take at $160. When, therefore, he made the offer, there was urgent necessity, if the Powder Company was to be safeguarded, for either the company to buy for itself or for the officers to buy for themselves, or for, as eventually worked out, the officers to take a third course, namely, to buy Coleman's entire holding for themselves, but to get the principal officers of the company to buy such part of the stock as Coleman, by his original offer had intended they should have. What followed is thus stated by Pierre Du Pont:

"Then what was the next step? A. I conferred with Mr. Raskob, Mr. Irénée Du Pont, Mr. Lammot Du Pont, and Mr. Carpenter with reference to this possible purchase of T. C. Du Pont's stock. We agreed among ourselves that we would attempt to make the purchase.

"Q. Suppose you give the court the narrative of the events and dates, and we will furnish the letters and telegrams afterward. You saw Mr. Dunham on the 17th, you say? A. Either the 16th or 17th; I think the 17th, Wednesday.

"Q. When did you see him next? A. When he reported that T. C. Du Pont was willing to sell all of his stock, but that he would not pool the remainder of that, unless he knew the condition of the pool.

"Q. Then you saw Mr. Raskob and several others whom you have named, and asked them to join with you in the purchase of the stock? A. I do not know that I asked them, but between us we agreed to endeavor to buy the stock. We suggested that Mr. Raskob go to New York to see whether a loan could be placed on the common stock of the Du Pont Company.

"Q. Did Mr. Raskob go to New York?  A. He did.

"Q. Did he go alone?  A. He went alone, so far as I was concerned; that is, I didn't go with him.  He reported to me that evening, and stated that he had called upon Mr. Porter, I think of Morgan & Co., who had taken an interest in trying to place the loan.  He said he thought it could be done.  Mr. Porter had gone out to make some inquiries, and on his return he told Mr. Raskob that he felt satisfied that at least $10,000,000 of the necessary $14,000,-000 could be placed, and gave him hope that the whole of the $14,000,000 could be placed.  Mr. Raskob reported that on his return to Philadelphia that evening.  I was in Philadelphia that evening."

Following this Pierre, on February 20th, made Coleman an offer for his entire holdings, and after some exchange of telegrams, Coleman on February 20th telegraphed his final acceptance.  That this enormous transaction was arranged for and closed in six days shows it was recognized that prompt action was necessary to prevent Coleman's holding going into the open market.

How the purchase was financed we have heretofore noted.  The purchase having been made and become public, the inquiry as to what stand William and Alfred Du Pont then took becomes all-important.  Did they then contend that Pierre had been constituted an agent at the meeting of the finance committee on December 23d?  Did they refer to the terms of such agency?  Did they claim that Pierre, as such agent, had violated his agency?  These questions become all-important, for it is quite clear that if then, or in the events that immediately followed the purchase, neither William nor Alfred averred that Pierre had been constituted the company's agent at the meeting of December 23d, we may with confidence rest on the conclusion we announced above, namely, that Pierre was not at such meeting of December 23d made an agent to negotiate further.

What, then, are the proofs in that regard?  William Du Pont, as we have seen, had been away from Wilmington.  He was in the South when he read in the papers of the purchase, and he at once telegraphed Pierre:

"Paper states you have purchased Coleman's stock, I presume for the company.  Any other action I should consider a breach of faith."

This telegram does not, of course, specify any agency, and its terms are broad enough to include such a relation; but when William Du Pont came North and attended a meeting at Wilmington about March 4th or 5th, at which Pierre was present, he did not then allege any agency.  What then took place appears in his testimony:

"Q. After sending that telegram, what did you do?  A. I came North.

"Q. Did you come to Wilmington?  A. I came to Wilmington direct.

"Q. Did you have any conference with anybody about this matter, or in connection with it, when you arrived in Wilmington?  A. I was asked to come to a meeting at the office of Mr. Alfred I. Du Pont.

"Q. When was that?  A. I think it was the evening of March 4th, but I am not sure.  It might have been the 5th.

"Q. Who were present at that meeting?  A. Mr. Alfred I. Du Pont, Francis I. Du Pont, Mr. Philip Du Pont, and several others.

"Q. Was Mr. P. S. Du Pont there?  A. Mr. P. S. Du Pont came into the meeting; also Mr. Irénée Du Pont, without invitation, as I understood.

"Q. Had you been informed, or were you informed then, who were associated with Mr. P. S. Du Pont in the purchase of this stock?  A. I think Mr. P.

S. Du Pont stated at that time who was associated with him; also I think the public print stated.

"Q. Do you recall who Mr. P. S. Du Pont stated were associated with him? A. No, sir; I could not state.

"Q. Did you say anything in that meeting to Mr. P. S. Du Pont about this matter? A. Yes.

"Q. Please state to us as well as you can. A. I cannot recall what words I used, but I objected to the purchase of the stock.

"Q. State as nearly as you can your recollection of what you said at that meeting in the presence of Mr. P. S. Du Pont. I do not mean the exact words. I mean as near as your recollection is as to the substance of what you said. A. I cannot give you the words any more than what I have said. I cannot recall anything more than what I have already said.

"Q. What did you say? A. I told him I objected to the purchase of the stock for himself.

"Q. Did you tell him why you objected to the purchase for himself? A. I cannot say. I did tell him once, but I cannot say whether it was at that meeting or afterward.

"Q. What did you tell him at any time as your objection? About what time was it you told him why you objected? A. I could not say.

"Q. Did you then tell him of your objection? Did Mr. Alfred I. Du Pont say anything to Mr. P. S. Du Pont at that meeting? A. Yes.

"Q. Give us, as near as you can, as far as your recollection goes, what he stated. A. He objected to the purchase of the stock, but I cannot give you the words.

"'Q. Can you give us the substance of his objection, why it was he objected? A. No, sir; I cannot."

· The proofs show that Alfred Du Pont, having learned of the sale on February 28th, had an interview on March 1st with Pierre. What took place is thus stated by Alfred:

"Q. The letter of Mr. T. Coleman Du Pont is dated the 19th day of February. Will you tell me when you heard next thereafter—when you heard anything about any sale of the stock of T. Coleman Du Pont? A. When I read an account of the purchase of T. Coleman Du Pont's stock by P. S. Du Pont and his associates in the Sunday papers on February 28, 1915. * * *

"Q. What did you then do on receiving that information in the paper? A. I waited until March 1st, thinking perhaps Mr. P. S. Du Pont would come and tell me something in regard to his having acquired the stock.

"Q. You waited until 4 o'clock on the day of March 1st? A. I did.

"Q. What did you do then? A. I telephoned to Mr. P. S. Du Pont and asked him if he would kindly come down to my office for a few moments.

"Q. Did he come? A. He did.

"Q. Then what took place between you in your office? A. I asked Mr. P. S. Du Pont whether the information conveyed by the Sunday paper regarding his having purchased this stock was correct. He informed me that in the main it was true. I then said, 'Do I understand that you have acquired all of Coleman Du Pont's stock, both common and preferred, of the Du Pont Company?' He said that he believed that he had. I said, 'What do you propose to do with it?' He said that the stock would be held by a holding company that he had organized for that purpose. I asked him who the stockholders in that holding company were. He said they were himself, his two brothers, Lammot Du Pont and Irénée Du Pont, his brother-in-law, Mr. R. R. M. Carpenter, and Mr. Raskob, treasurer of the company. I asked him in what proportions the stock of the holding company was divided among the gentlemen to whom he had referred. He told me that he would hold about 50 per cent., that his two brothers would hold about 16 per cent. each, and that the others would hold smaller amounts. I do not remember whether he stated exactly the amounts or not, but they were smaller amounts. I then asked him how he had financed the purchase for acquisition of this stock, and he told me he had borrowed through J. P. Morgan & Co., of New York, a large sum of money. I

asked him whether Morgan had loaned him the whole amount. He told me it had been redistributed among certain other banks, at least a large proportion. I asked him if he would kindly give me the names of the banks. He said he could not tell me the names of the banks. I then asked him whether he proposed to divide the stock acquired from T. Coleman Du Pont ultimately among the stockholders of the holding company in proportion to their respective holdings in the said holding company, and he told me that he did. I then said to him: 'Pierre Du Pont, don't do this. It is wrong.' He asked me why it was wrong. I said: *'Because you have accomplished something by virtue of the power and influence vested in you as an officer of the company, and by knowledge which you could only have acquired in your official capacity, which you could not have accomplished as a private individual. For that reason the stock which you have acquired in this matter does not belong to you, but belongs to the company which you represent.* I therefore ask you to turn this stock over to the company.' He said he was very sorry that he could not agree with my point of view. In a further endeavor to get him to make some concession along my line of thought, I said: 'Pierre, your father and my father were brothers. Neither of those men would have approved, I am confident, of what you have done. For their sake, as well as for your own, put that stock in the company's treasury, because you can't afford to do anything that will *invite criticism or condemnation on the part of any of your fellow bankers which would in any way injure your business reputation.'* I said: 'Pierre, I ask you.' He said he would not do it; that the thing was an accomplished fact, and could not be undone. I said: 'Then you refuse to make this concession which I ask of you?' He said: 'I do.' That terminated the interview."

On March 3d, Alfred again met Pierre at a meeting where a number of the Du Pont family, including Philip F. Du Pont, the plaintiff, were present, and restated his position in regard to the purchase by Pierre as follows:

"Q. When was the next conversation that you had on this subject when Pierre S. Du Pont was present? A. On the evening of March 3d.

"Q. Where was that? A. In my office in the Du Pont building.

"Q. Who were present? A. Myself, Mr. William Du Pont, I think Mr. Alexis Du Pont, Mr. Philip Du Pont, Mr. Eugene E. Du Pont, Mr. Francis Du Pont, Mr. Pierre S. Du Pont, and Mr. Irénée Du Pont.

"Q. What was the subject of the discussion at that meeting? A. The subject of his having acquired Coleman Du Pont's stock and the propriety of the manner in which it had been acquired.

"Q. Please state what was said to P. S. Du Pont on that occasion, so far as you recall, by yourself or any one else. A. I could recall what I said myself. It was merely a reiteration in a general way of the position I took on March 1st, that he owed it to the company to turn that stock into the company's treasury, owing to the manner in which it was acquired.

"Q. Did you hear anybody else say anything to him on that occasion along the same line? A. Mr. William Du Pont expressed himself on the same line; also Mr. Francis I. Du Pont. * * *

"Q. Give us, as near as you can, the position taken by Mr. William Du Pont and expressed to Mr. P. S. Du Pont at that time. A. As near as I can remember, he stated that he believed that Mr. P. S. Du Pont should turn that stock in to the company; *that he had purchased it in his official capacity, and he would consider any other disposition of the stock an infringement of the properties of his office or a breach of faith as an officer.*"

As will appear from this, Pierre Du Pont refused on March 1st to turn the Coleman stock over to the Powder Company. On March 5th, however, he receded from this position, and addressed a letter to the company, in which he stated:

"As our transaction was made in the form of an offer to T. C. Du Pont, I give the company similar opportunity to make an offer to me and my associates."

In this letter, Pierre Du Pont states his understanding of the acts of bad faith which Alfred and William Du Pont charge against him in acquiring Coleman's stock. In that respect the letter says:

"On that date, March 2d, I received the following telegram from Mr. William Du Pont: 'Paper states you have purchased Coleman's stock. I presume for the company. Any other action I should consider a breach of faith.' Mr. Alfred I. Du Pont expressed to me verbally a similar opinion. In taking exception to the accusation of bad faith, I learn that the meaning attached to these words is as follows: That I could not have made the purchase of this block of stock unaided by the company; that, therefore, the company is entitled to the stock. There seems to be no contention that my position in the company enabled (disabled?) me to receive an offer from Mr. T. C. Du Pont— the point being that I could not have financed the purchase of the stock without using company credit."

It further appears, from the minutes of the directors' meeting of March 5th, that William Du Pont and Alfred Du Pont were present at this meeting, that the subject-matter of this letter was discussed, and that no objection or exception to the correctness of Pierre's statement of Alfred's and William's position was made by them, nor any assertion that Pierre had been constituted an agent by the finance committee at its meeting of December 23d.

The letter was referred to the finance committee, which considered it at a meeting held March 8th, and again at a meeting of the directors on March 10th. Both these meetings Alfred Du Pont and William Du Pont attended, but the minutes do not disclose that any assertion was made by either of them that Pierre had been constituted an agent to negotiate at the finance committee meeting of December 23d. Indeed, that such allegation was not then made by Alfred or William Du Pont is not a matter of mere inference drawn from its nonappearance in the minutes; but in the brief of the plaintiff's counsel it is affirmatively stated no such statement was made by any one. In that regard the brief says:

"No disclosure was made for the benefit of the directors not members of the syndicate that Pierre had been instructed by the finance committee to continue negotiations for purchase by the company, or that the correspondence had ensued which had been attended to."

As Pierre Du Pont has always contended he was not so instructed by the finance committee, it is manifest that, if his contention was true, he had no information to give on that point, and therefore did not conceal anything. On the other hand, if such instruction were given by the finance committee to Pierre to continue negotiations, there was every reason why Alfred Du Pont and William Du Pont should then have called the attention of the directors to the fact of agency. Their not doing so on this and on the other occasions noted above emphasizes the correctness of our conclusion, stated above, that at its December 23d meeting the finance committee did not constitute Pierre Du Pont its agent for further negotiations with T. Coleman Du Pont. In further confirmation of this view, it will also be noted that when this bill was

filed, some six months later, even the bill was not based on the alleged fact that Pierre Du Pont had been made an agent to negotiate, by the finance committee, at its December 23d meeting, but, on the contrary, the charge of the bill was that Pierre Du Pont and his associates had violated their duties.    In that respect the gist and theory of the bill are properly summarized in the brief of plaintiff's counsel as follows:

"On December 8, 1915, the present bill was filed by Philip F. Du Pont, on behalf of himself and other stockholders, alleging  *  *  *  that *Pierre Du Pont and his associates had fraudulently* and in violation of *their duties* to the Powder Company acquired the Coleman stock for themselves instead of for the company."

It will therefore appear, from the pleadings of the bill, and from the absence of proof that such agency was alleged or urged on the several occasions referred to above, that the real ground of recovery contended for is not the failure of Pierre Du Pont individually to perform duties imposed on him as an agent by the finance committee on December 23d, but that Pierre Du Pont and his associates (who so far as the proofs go had no part or even knowledge of such alleged agency of Pierre) had, after Coleman withdrew his offer, fraudulently violated their duty as officers of the Powder Company in buying such stock.    It further appears, from the proof, that such fraudulent violation of their duty as officers was a conclusion based on the premise that the syndicate could not have bought the Coleman stock unless they had made use of the Powder Company's credit and resources and misused their position as officers to do so; and because they had made an otherwise impossible purchase, it is urged that the fact of the purchase in and of itself necessarily convicted these men of bad faith and fraud as officers of the company.    This position was summarized by Alfred Du Pont in testimony already quoted:

"I then said to him: 'Pierre Du Pont, don't do this.    It is wrong.'    He asked me why it was wrong.    I said: 'Because *you have* accomplished something by *virtue of the power and influence vested in you as an officer of the company,* and by knowledge which you could only have acquired in your official capacity, which you could not have accomplished as a private individual.    *For that reason* the stock which you have acquired in this matter does not belong to you, but belongs to the company which you represent."

No clearer, more concise, statement of the theory of this bill, and of Alfred Du Pont's consistent reasoning and contention in support of it, could be made than these words, which, it will be observed, in no way embody any allegation, relation, or malfeasance of an agent, but, on the contrary, is based on Pierre's duty as an officer of the company.    That this was Alfred's contention is shown by other witnesses.    Francis T. Du Pont, who intervened as a plaintiff in the bill, was present at the meeting of the Du Pont family on March 4th, and gives an account of the meeting.    His testimony makes no mention of any allegation of Pierre Du Pont's agency being made at this meeting, but says:

"Alfred Du Pont had taken the position that the deal *was financed on the credit of the company.    I took that position,* and went further; I took the position that a corporation had been formed, which controlled a large amount of stock, and therefore controlled the power to invest the company's money, and I took the position that that is what made the transaction possible; *that*

*it was the power over the company's treasury which was really back of the notes of the Securities Company.* He (William) also expressed himself, but just what he said I do not know. He expressed himself against the fairness of the transaction. * * * My impression is pretty strong that he said that the credit of the company had been used."

And the proofs further show this was the view then held by Francis T. Du Pont. He was asked:

"Will you tell the court in what respect it [the purchase of the Coleman stock] was unfair to the company?"

And said:

"Because I did not believe he [Pierre] had the money to buy it. * * * He secretly made some arrangement with Mr. Coleman Du Pont to get his stock. That arrangement none of the directors were told about. He was an officer. The treasurer of the company was co-operating with him, and was instrumental in placing large deposits at different banks in New York. Even if those same banks were not the ones which helped finance the company, and I am not raising that question, the very expectation that there would be those deposits gave him a power which, in my opinion, *he should have used for the company and not for himself.*"

After due consideration of this phase of the case, we are of the opinion, and so find, first, that when Coleman Du Pont, on February 16, 1915, offered to sell to Pierre Du Pont his entire holdings in the company, of 13,899 preferred and 63,214 common stock, that neither Pierre nor the syndicate in their own then relations as officers of the company, or by reason of any prior relations of Pierre as alleged agent to negotiate for the 20,700 shares for the benefit of the company's employés, were disqualified to buy Coleman's stock; and, secondly, that in subsequently obtaining the credit and money to pay for said stock, Pierre Du Pont and his syndicate associates made no use of the credit or resources of the Powder Company, or took any illegal advantage of their several official relations to the company.

[4] Having made the purchase, Pierre Du Pont, their representative, at first stood on his and their right to purchase and hold said stock, and refused to convey it to the company, but having subsequently withdrawn such refusal, and having offered, in substance, to allow the company to make such purchase itself, the question arose whether the Powder Company should buy this syndicate stock. This question, in various ways, came before the directors, the stockholders' meetings, and finally was submitted to the stockholders in an election directed by the court below and held by its master. In this master's election, a very substantial majority of stockholders voted against the company buying the stock, and the court below dismissed the bill. Such dismissal decree is here assigned for error. The court below predicated its action on the vote taken by the master, and declined to be influenced by prior actions of directors and stockholders' meetings. Following, for present purposes, the same course, we shall not recite or discuss the proofs as to such prior meetings and votes; but, assuming for the present that the master's election was, as we shall later show, a full, free, and intelligent expression of the will of the majority stockholders, we address ourselves to the question of

whether the court below committed error in ratifying the decision of the stockholders by dismissing this bill.

Turning to that question, what have we? A purchase by executive officers of the company of the holdings of its largest stockholder, and a later offer by them to the company to itself buy the stock at what it had cost them. We have already found that no fraud on the part of these officers, or any of them, was established by the proofs, nor do we now find that in such election the majority stockholders made a wrongful use of their power against a helpless minority, thus creating one of the cases of corporate wrongs, where courts have unquestionably the power and undoubtedly the duty to interfere. It follows, therefore, that a reversal of the decree of dismissal in this case, and the entry of one responsive to the bill, would in substance and effect have this court hold, first, the purchase could be lawfully made by the Powder Company; and, second, that it must be made, even against the wishes of the majority of its stockholders. To us, however, it has seemed that, assuming for present purposes, but not deciding, that the company had legal power to buy, the proofs show the question of exercising its power to buy was, after all, one of those business questions of corporate policy which the stockholders, through their majority, and not a court, through its equitable power, should decide.

Turning, therefore, to the proofs, let us see what they disclose in that regard. That such question confronted the stockholders was evidenced by the fact that when the offer of Pierre Du Pont to sell the stock to the company, embodied in his letter of March 5th, came before the directors at their meeting on March 10th, a resolution was introduced which, in substance, involved this question and dealt with the matter as one of business policy. This resolution, which was offered by Alfred Du Pont, was as follows:

"A resolution was offered and seconded that the president of the company, in conjunction with the finance committee, be requested to select a committee of men, who, in their opinion, are capable of passing upon this matter from an economic standpoint, and who are not in any way interested in the company as holders of the company's securities, with a request to make recommendations as to the propriety of the acquisition of the stock in question by the Du Pont Powder Company."

We refer to this resolution, which was not adopted, as evidencing the view, not only that it was one of business policy, but that, at the time this purchase was made, the question of the business wisdom and propriety of the Powder Company itself making this purchase was one of such substantial uncertainty that the then largest stockholder of the company urged that the views of competent, disinterested business men should be had before the company decided the matter. Indeed, that the question was a debatable one, on which men had varying views, is seen from the proofs.

Beginning with the views held by Alfred I. Du Pont, the largest stockholder of the company, his fear, as we gather from the testimony, was that the purchase of this large block of stock by these officers would create a burden which they could not shoulder, and

which the Powder Company would eventually have to, in some way, assume. Or, to quote his views in his own words:

"A. As near as I can remember, my argument was somewhat to this effect: That Mr. P. S. Du Pont and his associates had acquired the holdings of Mr. T. C. Du Pont by borrowing a certain large sum of money and by creating further obligations in the form of notes to T. C. Du Pont in payment for T. C. Du Pont's stock; that those obligations would have to be met by some one in some way at some time; and that I could not see any way of payment of those obligations other than *getting the money from the company*, and I so stated at the meeting before the directors.

"Q. Other than getting it from the company? A. Yes; getting it in some way from the company's treasury. In other words, the company would be looked to for the funds in some way to meet these obligations; that in view of this fact it would be very much better and much more to the interest of the company and its stockholders for the company to make the necessary investment to acquire this stock, than to be placed in a position at some subsequent time where they might be forced to make *disbursements* in order to meet these obligations, when it would not be desirable or convenient to the company to do so. That in general was the argument which I gave."

The anxiety of Francis I. Du Pont, one of the interveners in this bill, went a step further, in that he feared the control of the company, in case the notes were defaulted, would pass to Morgan & Co., by reason of the money having been borrowed from them. In that regard he testified:

"XQ. Did you not further say, 'I believe Morgan & Co. loaned the money with the full expectation that, in case those notes were not paid, they could force the payment from the company's treasury by some financial scheme?' A. Morgan & Co. could have gotten control of the company if the notes were not paid."

From another angle we have the views of the defendants, who were opposed to the company buying the Coleman stock. In that regard, Raskob, one of the defendants, testified at length as to his reasons for voting against the resolution to have the company make an offer for the Coleman Du Pont stock:

"Q. Did you vote for or against this resolution? A. I voted against it.

"Q. Give your reasons for voting against it. A. I had a great many reasons for not voting in favor of the purchase of this stock: First, I considered it not any part of my duty as a director and trustee for the stockholders to take $14,000,000 from the treasury of the company and speculate with it in the company's common stock; second, I knew that there had never been a precedent for any such procedure in the history of the E. I. Du Pont de Nemours Powder Company, nor did I know of any precedent in any other company where the board of directors voted to purchase as a speculative investment practically 20 per cent. of the total outstanding common stock of the corporation, or any other substantial amount. The book value of the common stock of the corporation at that time, which I knew to be about $118 to $120 a share, plus the uncertainties or plus some definite value which common stock might have through the orders, military powder orders, then in hand or likely to be secured, did not warrant any director voting in favor of the purchasing of that stock, stock of that character. The only arguments—the only reasons, for I did not think they were much in the way of arguments—that were offered in support of purchasing that stock, as I recall them, were offered by Mr. Alfred I. Du Pont, concurred in by Mr. William Du Pont, and some by Francis I. Du Pont. Those arguments seemed to be along the line that the company had made this purchase, or had in effect made it, if not actually in fact; the theory being that the syndicate would perhaps be unable to pay for this stock, in which event the Powder Company would have to pay

for it anyway, and they might as well have paid for it then, at the date of that meeting, rather than to find at some future date that they would have to take it up and pay for it. I, knowing full well the nature of the obligation which had been given to finance the transaction on the part of the Du Pont Securities Company could not follow that line of reasoning. I knew, for instance, that the note of $8,500,000 which had been given to J. P. Morgan & Co. carried as collateral 14,599 shares of the preferred stock; certainly under most any conditions that would have been worth $80 a share. That would have made a worth for this collateral of approximately $1,200,000. There were 54,591 shares of common stock held as collateral on that note, and if the value of the common stock had dropped to a point of $120 a share, which was about its selling price at a time previous to the war, the value of that 54,000 shares of stock, together with the value of the preferred stock of $80 per share, would have netted an amount sufficient to pay within about $800,-000 of the $8,500,000 loan; and for any one to assume that the guaranty of the six gentlemen back of that note was not good for $800,000 was beyond my understanding. I knew, furthermore, that the note given to Coleman Du Pont for $5,900,000 carried as collateral 36,900 shares of the common stock of the company; that that stock, if the worst should happen, and no profit whatever be realized from the business in hand, and the company be forced back to the position to which it was previous to the war—that is, in the position of having only their normal business—the common stock at $120 a share would have cared for all of the payment of the Coleman Du Pont note except, I think, about $1,500,000. That obligation of Coleman Du Pont ran for seven years. There was absolutely no power on his part to force the deposit of additional collateral, no matter to what point the common stock of the Powder Company which was held on that note as collateral would go, and therefore the underwriters of that note, these gentlemen who were—

"Q. Guarantors? A. No, they were not guarantors on that note; but the six gentlemen in question were principal stockholders in the Du Pont Securities Company, and to assume that those gentlemen, plus the other stockholders who were then in the Du Pont Securities Company, could not have taken care of an obligation or a guaranty or a shortage on collateral to the extent of $1,500,000 in seven years was to my mind unbelievable. I think without exception every director at that meeting must have admitted that. So that, from that point of view, that argument appealed to me as being an argument with no force whatever in favor of making an offer to purchase; in other words, I could not see why that argument should be used as a reason for voting in favor of the purchase of stock.

"Q. Have you any other reasons that occurred to you at that time why the corporation should not buy this stock? A. May I finish my answer?

"Q. You had not finished? A. No.

"Q. Go ahead. A. Another argument used at that time in favor of purchasing the stock was, as I understood it, that the collateral on this loan, if the Du Pont Securities Company were unable to meet this loan, would be sold and likely be captured or gotten control of by J. P. Morgan & Co. I felt that any director that would vote, or would use his vote, to prevent a certain block of stock going to one set of stockholders, no matter who they might be, in preference to another set of stockholders, would be committing a fraudulent act. Another reason for my voting against that resolution—no, the other reason that I voted against that resolution was because I felt very strongly, although I knew nothing about the law, that any director that would act in his capacity as trustee for the stockholders for the corporation to do a thing which in his judgment, or in the judgment of an ordinarily prudent man, would be injurious to the credit of a corporation, might in some way be held personally responsible in connection with his colleagues voting in favor of such a resolution for any losses which the company might have incurred in connection with that purchase. Mr. Laffey, counsel for the company, was called into the meeting and stated that the company, in his opinion, could not legally purchase its own common stock for investment purposes in an amount greater than the surplus of the company. But I did not go into that reason, or question him about it, because there were reasons sufficiently

256 F.—12

ample in my mind to justify voting against any such proposition without much consideration of that."

Irénée Du Pont, one of the defendants, gave his views on the company's buying the Coleman stock as follows:

"Q. How did you vote on the resolution reported from the finance committee with reference to the taking over of this stock or making an offer for it? A. I voted against making an offer for the stock.

"Q. Will you state the reasons that moved or actuated you in making that vote? A. I think the strongest reason is that the company should not speculate needlessly—should not go into speculation which it was not a part of its business to do, especially if that was to buy its common stock, and still more especially if it was at a high value for that common stock, $200 a share. I think that that would be wrong. I think any preferred stockholder would oppose it successfully. I know that *I would have been prepared to go after the thing, if they had attempted to make such a purchase.*"

The testimony of Carpenter, one of the defendants, was as follows:

"Q. Did you vote on the question or resolution that was reported back to the finance committee? A. I did.

"Q. How did you vote, for or against it? A. I voted against the acquisition of the stock by the company.

"Q. Will you please state your reasons—what reasons actuated you as a director in voting negatively on that proposition? A. I had a very strong feeling that it was the most unbusinesslike thing to do for the company to acquire such a large block of its own common stock, and I felt that any stockholder would have a rather good case against the directors, if they should buy that stock, and if for any reason the value of the stock should go down. I did not want to be in the position of having a suit brought to help pay that money back to the company."

Carpenter also testified that he was influenced in his vote by business reasons, as he "felt that the company needed all of the money it could raise to carry on the proposition that we had never attempted before. In that connection, and showing the tremendous work that confronted this company in making these war calls and contracts, the testimony of H. F. Brown is enlightening. Mr. Brown says:

"Q. Will you state to the court some of the conditions and circumstances that confronted the Powder Company in 1914 and early 1915? A. I was in a very good position to realize the situation at that time, being in charge of the smokeless powder operating department, to which department was intrusted the duty of completing perhaps three-fourths of the war contracts which were received. The smokeless powder department prior to the war contained in its smokeless powder department proper (we make other things besides smokeless powder) perhaps about 1,000 men. That includes common labor. Probably not over half of that total number could be called powder makers. Early in March, 1915, the amount of business which had been handed over to me to fill was very large. It was an amount of business far beyond the capacity of the plants to produce. I therefore called upon the engineering department to enlarge those plants. The engineering department undertook to increase the capacity of our plants in record time, and to do in *5 or 6 months* what previously would have *required 12 to 18 months.* We were called upon enormously to increase our operating force. It was impossible to obtain men skilled in the art of powder making. The manufacture of smokeless powder is perhaps one of the most difficult and exacting of all kinds of industry. Smokeless powder grains have to be made with wonderful accuracy, in order to obtain proper ballistic results. We were consequently confronted with a *very huge task.* We had to multiply our force. On the 1st of March orders in hand necessitated multiplying the force by at least

*10 times,* and where those men were to come from, and who was to train them, was an unsolved problem at that time. We took on those additional men. We had the task of training them in this very difficult business, and we undertook to fill these war orders at that time.

"Q. How many additional men were taken on? A. When we reached the maximum of our capacity, we had in my department about 40,000 men, as compared with 1,000 men at the beginning.

"Q. When was it you reached the maximum of capacity? A. We reached maximum capacity in May of this year.

"Q. About how much powder had actually been delivered on these war contracts in March, 1915? A. Prior to the 1st day of March we had delivered on export orders approximately 800,000 pounds of powder, and about 2,300,-000 pounds of gun cotton. We were behind our orders on the 1st day of March, 1915, about 300,000 pounds. The situation was causing me the greatest anxiety. I felt that we would be able to make good, but we were not making good. The officers of the company were all anxious about the situation. I will say that on the 1st of April we were still further behind, and it was not until the latter part of May that we caught up with our orders. The situation, therefore, about the 1st of March, 1915, was one of keen anxiety, and I felt that anxiety perhaps as much as anybody in the company, because it was upon my department that the chief burden was placed.

"Q. You say you were behind in the deliveries. Was that behind in deliveries under the contracts? A. Under the contracts. *We were behind contract requirements.*

"Q. And did *not catch up until May of 1915?* A. Right.

"Q. Am I right or wrong in that? You overtook your contracts about what time? A. It was not until the latter part of May, 1915, that we caught up with our contracts.

"Q. Was there any question involved in the problem about making deliveries, even if you manufactured the goods? A. We were keenly anxious at that time about the uncertainty whether these new men could be taught, and whether or not the use of this tremendous number of new men would involve an accident risk far beyond what we had ever had before. In other words, there was grave uncertainty whether or not, even if we manufactured this powder, or started to manufacture it, that in the process we might be involved in a calamity, owing to the inexperience of these men. We had plenty of accidents under normal conditions, but under those abnormal conditions I feared that some calamity might easily be possible. In the next place, I recall very distinctly that we were very anxious in regard to whether or not we would be permitted to ship the powder after we had made it. I remember that prominent men in and out of Congress were clamoring for an embargo to be placed upon shipments of explosives, and I think many of us felt very uncertain whether or not we would be permitted to ship this powder out of the country after we had made it. That was another element of uncertainty in the situation."

In view of these conditions, Mr. Brown, a director, voted against the acquisition of the stock by the company, and as his reasons therefor he testified as follows:

"A. I voted against that because I considered that the purchase of that stock by the company would be a highly speculative proposition. I considered it would be highly speculative for the reasons I have already named in my previous answer. I was very well familiar with the circumstances attending the filling of these enormous war orders at that time, and I considered that the future was highly speculative, that the profits on these war orders had not been made, and that it was absurd for the company to pay at that time $200 per share for its common stock in the purchase of this stock from P. S. Du Pont and his associates."

The reasons which William Coyne, another director, gave as influencing his vote against the purchase, were:

"A. I had quite a number of reasons. The most powerful one was the highly, as I considered it then, speculative value placed upon the stock of $200—the uncertainty that was in my mind about our ability to fulfill those large contracts in the contract period. As I recall it, we never made more than 6,500,000 pounds of military powder in a year before, and we were then called upon to make seven or eight times that much. A number of green men had to be trained. A number of engineering men had to be trained to make our machinery and build our plants. The time, which was of the essence of practically all the contracts. *The return of the advance payments in the event* of our being *unable to fulfill the contracts.*

"Q. Did you know of any bonds for return of advance payments? A. Yes; I knew that in case of the *Russian* powder orders we had to put up a bond to *return* the advance payment in the event of our *not fulfilling the contract.* Then I felt that there might be some embargo placed upon the exportation of explosives, and a very important factor in forming my opinion was my experience with the Lake Superior Company. I was with that corporation prior to my coming with the Du Pont Company in 1904, and some time prior to my going with the Lake Superior Company its officers and directors had purchased large blocks of its common stock, which had depreciated very much in value after the purchase, causing the company great loss, and there was quite an international scandal about it, and threatened suits against all the officers to make them recoup the company."

Lammot Du Pont, a member of the purchasing syndicate, testified as to his reasons for opposing the Powder Company buying, as follows:

"Q. What were your reasons for voting against making the offer? A. As I remember at that time, I had several reasons. I think the principal one was that so far as I could see there was no reason why the company should buy the stock. The chairman of that meeting had asked for reasons why the company should offer to buy the stock, and no rational reason for doing so was presented. I knew of no reason, and I thought that it was pretty good policy not to pay out a large sum of money like that without having a reason for doing so.

"Q. Did the question of purchasing such a large block of the company's own stock by the company itself enter into your consideration? A. I thought it was an unwise thing to do, because the value of the stock at that time was very largely speculative. I thought that it was an unwise thing for the company to speculate in anything apart from its own business, that of manufacturing and selling explosives."

Eugene E. Du Pont, who occupied the same relation, testified to his reasons for opposing the purchase by the company of the Coleman stock, as follows:

"Q. Will you kindly state some of the reasons, or any of the reasons, that influenced you to vote against the acquisition of this stock? A. My main reason for voting against it was that I considered it entirely too speculative. I considered that the Du Pont Company had been earning for their stockholders, through the legitimate manufacture of powder, not through any speculation in their own stock. I considered that the *earnings* of the Du Pont Company should be made in the *legitimate* manufacture of powder and not *through speculation* in its own shares of stock in any way. I considered that has been the policy of the company for nearly the last 100 years; and I saw no reason why we should deviate from that policy. Furthermore, I did not hear in that meeting *any* logical argument for the purchase of the stock. Those were my two main reasons for voting against it."

The testimony of E. G. Buckner bears largely on phases of the situation not touched on by other witnesses. Buckner negotiated large war contracts with foreign governments. He insisted on and obtained great payments in advance from these governments when the contracts were

made—a policy which aided in financing the vast outlays in buildings, raw material, and equipment necessitated by these contracts over normal conditions. Apart from the policy of a company buying its own stock, Buckner's view was that such a course would result in the Powder Company being unable to get any advance payments on contracts thereafter. His testimony in that regard was:

"Q. Please state to the court what your reasons were for voting against that resolution. A. To begin with, I was very much opposed to the proposition from every standpoint. I did not believe that it was a proper thing for the company to do under the conditions that existed at that time. I felt that it would be a great mistake for the company to invest any of its capital in its own stock. Really, I was opposed to the matter on principle. I did not believe that it was a proper thing for a director, or for a board of directors, to do, to unite in purchasing its stock for speculation under the conditions that existed at that time, or under any conditions almost that you might suggest to me, I think I should have been opposed to it. I have never been in favor in all my life, in any institution that I have been associated with, of its buying and speculating in its own stock. I believe that it was bad practice, and I believe have got the support in that belief of many of the Legislatures throughout the country who have legislated against it. I think it is a dangerous practice, and would have been opposed to doing it if there were no other grounds than that; but there were other reasons at this time that made me feel that it was unwise for us to buy our own stock. The suggestion had been made that we had plenty of money up to that time. Up to the time that this proposition came before the board, this company did not have any great surplus of money. We had liabilities, many of them. We had a large amount of indebtedness in the shape of bonds, and at no time had we ever felt that we had more money than we wanted, and that there was any occasion to reduce our capital stock. That being true, I did not feel that it would be right for us at this time to take the money that had been paid to us by these nations that had bought powder from us, and to invest it in this purchase. Being as I was associated with those people in selling them material, I had realized how difficult it was to obtain advances. They had opposed it for several months, paying us this great cash advance. They wanted us to take it in other ways of security. They wanted to deposit it in bank, and have it paid over to us after we had fulfilled the contract; but I had made them understand that this was their war, that we could make them powder, that we would make them powder if they would assume all the risk there was in the manufacture of it, and so I insisted that they must pay us this 50 per cent. They had finally agreed to it, and had been trading on that basis. I felt at this time that, if the board of directors exhibited any such spirit towards the investment of that money, that *had been paid to us to build plants and buy raw material,* that if we undertook to use that money in the purchase of this stock, that it would at once stop my ability to sell powder. We would have found an opposition towards paying us this money to be used in that way, and I thought that, if we went into such a transaction as the one that was proposed here, I might as well stop trying to sell powder, and I really believe that, had we done it, those people would have said to us, 'We are unwilling to pay you this cash advance,' and our business, instead of being the enormous business that it is to-day, in my judgment would have stopped at that time."

As we have seen, some of the testimony which has been quoted above referred to the speculative character of this stock as an element in inducing them to object to its purchase by the company, but none of the witnesses testified to certain extraordinary conditions affecting this company's future, which made the stock of the company of speculative value, utterly different from that of the ordinary manufacturing company in ordinary times. We have seen how in December its largest stockholder, T. Coleman Du Pont, regarded the stock as worth $200,

while Alfred I. Du Pont regarded it as worth substantially $125, and we shall see that by the end of the year the phenomenal fluctuation in value of the stock was far distant from the views of either of these men. It is to some of the uncertain elements on which the value of the Powder Company's stock depended, Mr. Buckner refers in his testimony:

"Q. What were the hazards and risks that you considered at that time in giving your vote as you did? A. We had sold all of the output of the plants that we had constructed. There was no doubt in my mind but that we could manufacture that powder from the plants that we then had in existence with the men that we then had employed, and had had for years, and with the organization that then existed; but the minute that we started beyond that, and commenced to sell the other 54,000,000 pounds, there was a hazard wrapped about that, that was very uncertain. In the first place, *we had no plants*. We had to go to untried manufacturers of machinery, of construction work, building, and depend upon them to supply us with this material for the construction. That was an immense undertaking. We had only allowed ourselves in the contracts 5 to 6 months to begin deliveries, and these goods we had to give to untried people, and had to rely upon untried people to supply us with this construction material, and we then had to rely upon the manufacturers of raw material. There was a question of railroad facilities. We had to depend upon the railroad people much to get this material to our plants, and you must bear in mind that the time was very limited that we had to do this in. Then the question of labor, to obtain men to make this powder. We had sold all the capacity we had, and for all this future work it required new men, untried men, and we had to rely upon them. That was one hazard. Another was that at that time there was great uncertainty as to whether we would be able to complete our manufacture, due to the efforts on the part of people who wanted to destroy all of this work, and you must remember that there was a great effort made from every direction. People were attempting in every way to stop us in Congress, and the people who were attempting to make this material for us found great difficulty, due to the efforts on the part of overzealous friends who were striving to interfere, and there was much effort made on the part of our own employés to interfere.

"Q. Illustrate that. Tell us what way they interfered. A. They interfered in the way of the manufacture of material. We had made many hundred thousand pounds of powder, and believed that it was perfect in every particular, and packed it into boxes that were, according to contract, air-tight. The powder was clean and in fine shape. Samples would be withdrawn from the boxes, and we would offer them to the inspectors of the foreign countries, and when they arrived and made their own inspection, through their samples, they found all kinds of trouble had been created. *Nails had been driven into the boxes* to cause leaks of the powder. *All kinds* of foreign matter, it did not matter *what it was*, that a fellow could get hold of, he *dropped into the boxes*. Nails, dirt, old lunches, rags, anything that he could get hold of, he would put in those boxes, in order to make it undesirable and cause a rejection of it. We had many an explosion. Of course, we have never been able to trace the explosions to causes that were antagonistic to us; but there were explosions all the time all the same, and it caused us great difficulties. We did not know to what great extent those things might grow.

"Q. Did you take into consideration the possibility of the stopping of the war? A. Yes. That was another consideration we had had. * * *

"Q. How about inspection of the powder? A. I have just told you about the inspection, how they would reject the powder, the danger of our ability to deliver powder due to inspection.

"Q. Did the rejection of powder amount to any considerable quantity? A. It did. At times it was quite large, but the great hazard in reference to inspection was due to the fact that as long as they wanted the powder, as long as they were anxious to get it, they weighed the difficulties that we were encountering and took the powder as it was; but when they reached the point where they did not care to have the powder, when there was any occasion

that came up that they might not want to accept it, they were very rigid in their inspection, and were inclined to throw the powder back on our hands for the smallest reasons, and at times that grew quite difficult and made it very uncomfortable for the company."

In quoting the testimony of all these witnesses bearing on their reasons for respectively urging or opposing a purchase of the Coleman stock by the Powder Company, we have not overlooked the fact of the personal, financial interest those witnesses had, which would necessarily affect their views, for it will be apparent that Lammot Du Pont and other witnesses held portions of Coleman's stock, which had tremendously increased in value, when this bill was filed, and which the bill, inter alia, sought to take from them for the company. On the other hand, we can also see that Alfred I. Du Pont, who was the largest stockholder of the company, and other witnesses for the plaintiff, had large financial interests if the company acquired at $200 its own stock, which, when the bill was filed, was selling at several times that price. In the light of the interest of all these witnesses in the premises, and recognizing how their interest might color their views as to the proper business policy to be pursued by the company, we turn to the testimony of two witnesses, one of whom was, as far as we can see, free from personal financial interest when he voted on the subject of purchase by the company, although he afterwards became a purchaser of syndicate stock. We refer to Henry F. Du Pont. The other, who at no time has had any personal financial interest or bias, was C. L. Patterson.

In April, 1915, Henry F. Du Pont became interested in the T. Coleman Du Pont stock by exchanging his Powder Company stock for stock in the Du Pont Securities Company, which had purchased the T. Coleman Du Pont stock; but on March 10th, when as director of the Powder Company he voted against that company buying the Coleman stock, he was not interested in said stock. Such being the case, the business views of Mr. Du Pont, which were:

"A. I voted against it because I *did not approve* the company buying *its own stock*, particularly as the stock was *speculative* at that time, and all the funds the company had on hand I thought should be kept for the enlargement of its plants, buying raw materials, and in case of many contingencies that might arise. Contracts might be canceled. The war might be over"

—carry conviction. Like views were held by Mr. C. L. Patterson, also a director and one of the vice presidents of the Powder Company. He voted at the directors' meeting of March 10th against the Powder Company buying it. His reasons were as follows:

"Q. I understand you to say that you had no interest in the subject, except to do your duty as a director? A. None whatever.

"Q. Will you give the court your reasons for voting against that purchase? A. There were several reasons. The principal reason was that it seemed to me the commercial risk was too great and there were several other reasons. ✻ ✻ ✻

"Q. Will you please name them as far as you can? A. It seemed to me that there were a great many factors, the uncertainty connected with the business at that time, which made it very doubtful as to the ultimate outcome of the earnings of the company; the duration of the war was one, and bills

in Congress which might prohibit shipment of munitions of war abroad was another. I think these are the principal reasons."

[5] We shall not consider in detail the events which followed in the way of votes by the stockholders at corporate meetings supporting the action of the directors in declining to take this stock for the company. For present purposes it suffices to say the court below, after careful consideration, determined to submit to a vote of the stockholders the question whether or not the Coleman Du Pont stock should be acquired by the Powder Company. This was done by an order which, inter alia, provided:

"(6) That the question whether said E. I. Du Pont de Nemours & Co. shall acquire said stock, and the dividends or proceeds of dividends thereon, shall be submitted to the stockholders of said corporation at a meeting to be called for that purpose by, and conducted under the supervision of, a special master appointed by this court.

"(7) In determining the decision arrived at by the stockholders, any votes cast upon the 126,628 shares of the common stock of the E. I. Du Pont de Nemours & Co. received as a dividend upon the 63,314 shares of the E. I. Du Pont de Nemours Powder Company shall not be counted."

Such order was in accord with the prayer of the bill.

"(8) That a decree be entered that the matter of acquisition of the stock of T. Coleman Du Pont or the proceeds thereof in the stock of E. I. Du Pont de Nemours & Co. *be submitted to a duly called meeting* of the stockholders of the E. I. Du Pont de Nemours & Co., and that it be decreed that at said meeting of the stockholders aforesaid of E. I. Du Pont de Nemours & Co. that the holders of the stock acquired from T. Coleman Du Pont or the proceeds thereof in the stock of E. I. Du Pont de Nemours & Co., be enjoined from voting such stock."

Indeed, this submission to the stockholders of the company of the advisability of the company making this purchase, thus made by the court in response to the prayer of the bill, was in accord with settled legal principles. Of the general right of courts of equity to protect minority stockholders against the fraudulent and oppressive control of a majority there is no question; but where the question between stockholders is one of the business policy of a corporation, courts do not interfere with corporate control. In that regard the general attitude of courts toward corporate management, is fairly stated in Thompson on Corporations, § 4483:

"All questions within the scope of the corporate powers, which relate to the policy of administration or of expediency of proposed measures are for the good faith decision of the majority. As said by one of the courts: 'When the management is not shown to be fraudulent or dishonest, and when it is a matter of opinion *whether it is wise or unwise, advantageous or disadvantageous, if the acts complained of be intra vires, there is no authority for equity to interfere. To do so would be to place the control indirectly in the hands of the minority*, whenever interference removes from control the officers selected by the majority. There is certainly no presumption that a minority stockholder is right, and a majority stockholder is wrong, in opinion as to values and the managing of the corporate property.' "

And in Clark on Corporations, 498, 499, as follows:

"Nor can the holder of a majority of the stock of a corporation so conduct and manage its affairs *in their own interest*, or in the interest of others as

to oppress the minority, or commit a fraud upon their rights. If they attempt to do so, a court of equity will, in a proper case, grant relief, at the suit of the minority. However, the judgment of the majority *is not lightly to be set aside, and fraud or oppression must clearly appear.* 'The holders of a majority of the stock of a corporation may legally control the company's business, prescribe its general policy, make themselves agents, and take reasonable compensation for their services. But, in thus assuming the control, they also take upon themselves the correlative duty of diligence and good faith. They cannot lawfully manipulate the company's business in their own interests, to the injury of other stockholders.' It is not every question of mere administration or of policy in which there is a difference of opinion among the shareholders that gives the minority a right to claim that the action of the majority is oppressive, and to come into a court of equity for relief. Generally, the will of the majority must govern, if its action is within its corporate powers. 'The court,' it was said in a New York case, 'would not be justified in interfering, *even in doubtful cases, where the action of the majority might be susceptible of different constructions.* To warrant the interposition of the court in favor of the minority shareholders in a corporation or joint stock association, as against the contemplated action of the majority, where such action is within the corporate powers, a case must be made out which plainly shows that such action is so far opposed to the true interests of the corporation itself as to lead to the clear inference that no one thus acting could have been influenced by an *honest desire to secure such interests, but that he must have acted with an intent to subserve some outside purpose, regardless of the consequences to the company, and in a manner inconsistent with its interest.*' "

At such election held by the master, the stockholders had the full benefit of after events, of the full disclosure of all the facts which had been proved in this case, and of a full discussion of such proof by the learned judge of the court below. It is apparent, also, they had further light on the question of the legal power of the Powder Company to make this purchase. It will thus appear that the whole question was before them, and, excluding from such vote the stock purchased from Coleman Du Pont, the large majority of the stockholders of the Powder Company voted against the company buying the stock.

[6] Complaint is made that the stock owned by the defendants and other persons who had bought Coleman Du Pont stock, and also family relatives were allowed to vote. We see no reason why the stock held by such persons should be excluded from the count, because the owners of that stock also owned some of the Coleman Du Pont stock which was not voted. For it is manifest that, if the ownership of the Coleman Du Pont stock created such an interest as disqualified such persons from voting, it is equally clear that a like adverse interest existed in Philip F. Du Pont and the other plaintiffs, who were and would be directly interested in the Powder Company, obtaining at $200 Coleman Du Pont's stock, which was of much greater value. So, also, if the relatives of the defendants were incapacitated by such relationship, and were thereby prevented from voting with the defendants, the same relationship would have incapacitated such of the plaintiffs' relatives as voted with them. To forbid a stockholder from voting on a question of policy simply because he is related to a person who favors or opposes such policy is a contention that will not stand the test of reason.

From these considerations it is quite evident the master did no injustice in his conduct of the court's election.

And there was another large element in this action of the stockholders, which must have entered into the minds of disinterested stockholders, and which, if this bill were to be otherwise sustained, might well cause a court of equity to now decline to decree that the Powder Company should be awarded this Coleman Du Pont stock at $200, and might well justify stockholders at the master's election in refusing to vote that the company buy this stock. That is the element of delay. This stock was acquired by the syndicate in February, the directors declined to take the stock for the company in March, and this bill was not filed until December. In the meantime the stock had increased to an extraordinary value. It was known in March that the company by its directors had declined to take it. If the directors took this step in violation of their duty, the wrong was done then, and the basis for legal redress then existed. Nothing happened since to change the rights, obligations, or liabilities of all concerned. But no steps were taken until nearly nine months afterwards. Indeed, the proofs show that the plaintiff, Philip F. Du Pont, did not consult counsel until September, and did not file the bill until December. The proofs further show that up to that date Alfred I. Du Pont and William Du Pont had no part in the filing of the bill, and that neither they nor any other of the plaintiffs intervened until January, 1916. In the meantime the whole situation had changed. The expansion of the company's business had gone on, uncertainties had become certainties, and the business had proved so successful, such large profits were so certain, that the stock increased rapidly in value. This substantial change in the affairs of the company made the question of the purchase of this stock at $200 when the bill was filed a wholly different question from the uncertain speculative question it was in March preceding, and this bill, filed in December, stands in a very different light before a court of equity from what would have been the case, had it been promptly filed. If the company had been unsuccessful, if the fears of Alfred I. Du Pont, and those who thought with him, had proved well founded, and the syndicate had not been able to take the stock, and there had been an effort to compel the company to take it, there can be little doubt—indeed, the proof by one of the stockholders is—that legal steps would have been taken to prevent the company taking it, if such attempt had been made. Had the vast expansion of business resulted in loss, had the company been unable to fulfill its contracts, it is quite evident the resources of the company might have been swept away.

Viewing the case from every aspect, we see no reason to differ from the conclusion reached by the stockholders, evidenced by their vote at the master's election, against the company taking the stock, and we find no error in the court enforcing that conclusion by dismissing the bill. In view, however, of this bill having been filed by Philip F. Du Pont, who was an unofficial stockholder, of its being filed, as he conceived it, for the benefit and protection of like stockholders, and for the benefit of the company, we are inclined to the

belief that the decree of the court below might be modified, by directing that the costs of the case be paid by the Powder Company. While this is our present view, yet, as that question was not raised or discussed, we shall leave it open for any person or party so desiring to be heard on that question. But, if no one so moves, we will, as we have said, so modify the decree of dismissal by directing the Powder Company pay the costs of the case.